UNITED STATES of America, Appellee,

v.

Barbara NOLAN and NHG Pension Associates, Inc., Defendants,

August Mezzetta; GB Resources, Inc.; and Gotham Associates, Ltd. Partnership, Defendants–Appellants.

Nos. 423–425, Dockets 96–1828, 96–1830 and 96–1831.

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1997.

Decided Feb. 2, 1998.

Robert M. Appleton, Assistant U.S. Attorney, Bridgeport, CT (Christopher F. Droney, United States Attorney for the District of Connecticut, Bridgeport, CT, of counsel), for Appellee.

David T. Grudberg, New Haven, CT (Jacobs, Grudberg, Belt & Dow, New Haven, CT, of counsel), for Defendants–Appellants.

Before: VAN GRAAFEILAND and McLAUGHLIN, Circuit Judges, and GERSHON, District Judge.[*]

VAN GRAAFEILAND, Circuit Judge:

August Mezzetta, GB Resources, Inc., and Gotham Associates, Ltd. Partnership, were convicted after a jury trial of conspiring to embezzle the assets of a pension plan covered by the Employee Retirement Income Security Act of 1974 (ERISA), in violation of 18 U.S.C. § 371, and of embezzling such assets, in violation of 18 U.S.C. § 664. Mezzetta also was convicted of making false statements in documents which ERISA requires pension plans to keep as part of their records and of causing false statements to be made in an Internal Revenue Service Form 5500, both in violation of 18 U.S.C. §§ 2 & 1027. Barbara Nolan pleaded guilty to one count of embezzlement pursuant to a plea agreement and cooperated with the Government in its case against the appellants. NHG Pension Associates, Inc. ("NHG"), a defunct corporation, was not served with the indictment and was not tried. We affirm.

## BACKGROUND

In the mid–1970's, Mezzetta was responsible for managing certain funds of the pension plan of Local 12 of the Union of Roofers, Waterproofers, and Allied Workers ("Roofers"), an employee pension benefit plan within the meaning of ERISA, 29 U.S.C. § 1002(2). In 1977, Nolan met and worked with Mezzetta at PaineWebber, Inc. Soon thereafter, they joined Norman H. Gershman Co., a New York brokerage firm. While there, Mezzetta and Nolan formed NHG as an entity through which they could continue to manage the Roofers' fund. Mezzetta was President of NHG and Nolan worked with him.

In 1981, Mezzetta and Nolan created the NHG Master Retirement Trust (the "Trust"), with NHG as settlor and U.S. Trust Company as custodian. At Mezzetta's direction, NHG put the Roofers' assets into the Trust, along with other pension fund assets they were managing. Roofers did not know that their assets had been placed in a commingled trust account.

In January 1983, Nolan succeeded Mezzetta as President of NHG. In August of that year, Mezzetta and Nolan appointed GB Resources—another firm they created and owned—as "investment manager" of the Trust. Mezzetta instructed the trust officers at U.S. Trust that they were to take instructions from GB Resources in connection with the investment of the Trust assets. Based on the Trust agreement, the U.S. Trust officers viewed themselves as "directed trustees"—obligated to follow the instructions of Mezzetta and Nolan with respect to the Trust assets, so long as their indicated purpose was facially consistent with the Trust agreement. At this time the Trust assets were worth about $725,000, most of which appears to have been Roofers' money.

Shortly after creating GB Resources, Mezzetta and Nolan formed another firm, Got-

---

[*] The Honorable Nina Gershon of the United States District Court for the Eastern District of New York, sitting by designation.

ham Associates, Ltd. Partnership, for the purpose of making real estate investments. Mezzetta and Nolan made themselves general partners of Gotham, with a total interest of five percent, and by November 1983 numerous limited partners held the remaining 95 percent interest.

In November, Gotham purchased an apartment building on East 82nd Street in Manhattan for $735,000. Although Roofers had made it clear to Mezzetta in 1981 that he was not to invest pension plan money in real estate, Mezzetta and Nolan financed the purchase of the 82nd Street property with a $600,000 loan from the Trust. After one of the lawyers in the loan transaction expressed a concern about an apparent conflict of interest, because Mezzetta and Nolan were involved with both the lender and the borrower, Nolan appointed an outside consultant, Marvin Cohen, to act as the Trust's "cofiduciary" in regard to the Gotham loan. The loan from the Trust to Gotham called for ten percent annual interest payable monthly, a balloon payment at the end of the note's five year term, and a 25 percent annual penalty interest rate should Gotham fail to make the balloon payment on time.

In May 1985, Mezzetta, with Nolan's concurrence, refinanced the 82nd Street property so that Gotham could buy more real estate. In the process, Gotham secured a new loan and subordinated the 1983 note to it. With the proceeds of the 1985 loan, Mezzetta bought two more properties. Also in 1985, Mezzetta, apparently acting on his own, bought a building at 1–7 Clinton Street in Manhattan. He created 1–7 Clinton Street Associates for this purpose, with himself as general partner. Although Mezzetta informed U.S. Trust that the Trust was buying this property, he later told Bank officers that the Trust had no interest in the property and that the money to buy it did not come from the Trust. However, Mezzetta later attempted to amend the 1–7 Clinton Street Associates partnership agreement to reflect a Trust interest in this entity.

In 1987 the 82nd Street property was refinanced again and the 1985 loan was paid off. The 1983 Trust–Gotham note remained subordinated. Using proceeds from this latest refinancing together with $50,000 withdrawn directly from the Trust, Mezzetta and Nolan bought out the Gotham limited partners. Thus, by mid–1987, Mezzetta and Nolan owned Gotham outright.

Later in 1987, Gotham stopped paying interest on the Trust–Gotham note. The note came due in 1988, but Gotham did not have the funds to pay it. Mezzetta and Nolan, acting on behalf of the payee and without notice to Roofers or the other participants in the Trust, and without the approval of U.S. Trust Company, extended the note until 1993, with interest continuing to accrue.

When an officer at U.S. Trust discovered that the Trust was not being paid the interest due it under the note, he wrote to Nolan, intimating that all the transactions starting with the $600,000 withdrawal from the Trust were illegal under ERISA. He told Mezzetta and Nolan that no further withdrawals would be permitted for anything to do with real estate on the ground that such withdrawals would not be facially valid under the Trust agreement. This did not stop the defendants' machinations. "Advisory fees" were "facially valid" expenditures which obligated U.S. Trust to release funds from the Trust. By the fraudulent use of this term, Nolan and Mezzetta overdrew at least $640,000 from the Trust. Mezzetta and Nolan characterized other withdrawals as "participant" withdrawals, which also were facially valid. However, they used the proceeds to pay for building repairs and the purchase of life insurance policies.

In 1989, the Roofers' fund retained two accountants, Glen Belush and Doug Bebbington, to audit its assets in Mezzetta's care and to prepare a 1988 IRS Form 5500, a document containing financial and other disclosures which Roofers was required to file with the Department of Labor. In August 1989, Mezzetta submitted a portfolio evaluation report to Roofers which included vague references to "1–7 Clinton St.—225,000" and "NHG Master—631,872.36." Belush testified that, prior to completing and filing the 1988 Form, he repeatedly asked Mezzetta for more information about "1–7 Clinton Street" and "NHG Master," but that Mezzetta never responded. Belush completed the Form with

the information he gleaned from Mezzetta's August 1989 report to Roofers, and told Mezzetta that he had done so. Belush filed the 1988 Form in January 1990. Thereafter, Belush continued to ask Mezzetta for information about how Roofers' assets were invested, which he would need for the 1989 Form, due to be filed in March 1990. Mezzetta engaged in evasive and obfuscatory behavior throughout this process, forcing Belush to file the 1989 Form with information Mezzetta knew to be incomplete and inaccurate.

In April 1990, during a meeting between Mezzetta and the Roofers' trustees, Roofers' plan administrator produced a 1987 portfolio evaluation letter which he had received from Mezzetta. The letter plainly was intended to mislead, for in it Mezzetta made only passing reference to mortgages and failed to mention the NHG Master Retirement Trust, the $600,000 loan to Gotham, or any of the specific properties Gotham had bought. Nolan testified that Mezzetta prepared and submitted additional portfolio statements to Roofers in 1990–91 containing deliberate falsehoods.

The defendants were indicted in January 1995. Nolan pleaded guilty in August of that year and testified against the remaining defendants. Nolan's testimony and other evidence presented at appellants' trial clearly established the above-described facts. The district court sentenced Mezzetta to a prison term of 87 months and ordered that he pay restitution in the amount of $2,819,250. Gotham was sentenced to a five year term of probation and ordered to pay restitution. GB Resources was ordered to pay a special assessment.

## DISCUSSION

Appellants assert several grounds for reversal, none of which has merit. Appellants challenge first the district court's jury instruction on the good-faith defense to the conspiracy and embezzlement charges in counts One and Two of the indictment. The statute that appellants were convicted of violating and conspiring to violate is 18 U.S.C. § 664. This statute makes it unlawful for anyone to embezzle, steal, or unlawfully and willfully abstract or convert to his own use or to the use of another, any of the monies, funds, securities, premiums, credits, property, or other assets of any employee pension benefit plan which is subject to any provision of title I of ERISA, or any fund connected with such plan.

This language is almost identical with that of 18 U.S.C. § 501(c), which prohibits embezzlement of union funds. These two sections therefor are interpreted in the same manner insofar as the conduct they prohibit is involved. *See United States v. Andreen,* 628 F.2d 1236, 1242 (9th Cir.1980). However, there is an unfortunate lack of uniformity among the circuits as to what that "same manner" is. All are agreed that, because embezzlement is a criminal offense, proof of unlawful or criminal intent is necessary, but not all are agreed as to how such intent is established. *See id.;* Brian H. Redmond, VALIDITY, CONSTRUCTION, AND APPLICATION OF § 501(C) OF LABOR–MANAGEMENT REPORTING AND DISCLOSURE ACT, 29 U.S.C. § 501(C), PROHIBITING EMBEZZLEMENTS OF UNION ASSETS, 85 A.L.R.F. 803.

Indeed, judges in the same circuit not always have agreed as to how the existence of such criminal intent is proven. *See, e.g., United States v. Silverman,* 430 F.2d 106 (2d Cir.), *modified,* 439 F.2d 1198 (1970), *cert. denied,* 402 U.S. 953, 91 S.Ct. 1619, 29 L.Ed.2d 123 (1971). One reason for this may be that the issue of wrongful intent usually is expressed as the presence or absence of a good faith belief, which smacks somewhat of a shifting burden-of-proof affirmative defense. Another reason perhaps is the wide variety of factual situations that bring these statutes into play. "The principle of *stare decises* is applicable only where the facts in the two actions are the same." *Hurley v. Tolfree,* 276 A.D. 778, 779, 92 N.Y.S.2d 632, 634 (1949) (mem.).

We find no evidence of such disagreement in the instant case. The only disagreement asserted here is appellants' attempt to demonstrate a conflict between our holdings in *United States v. Ottley,* 509 F.2d 667 (2d Cir.1975) and *United States v. Butler,* 954 F.2d 114 (2d Cir.1992), a conflict that in fact does not exist. In *Ottley,* which involved

authorization of expenditures for personal use of a union-owned automobile, the trial court instructed the jury to consider only two matters on the issue of good faith: (1) whether the expenditure at issue was authorized by the union and (2) if not authorized, whether the defendant believed in good faith that he had authority to make the expenditure. 509 F.2d at 690. Nothing was said about benefit to the union. We held that this instruction did not suffice—the jury also had to determine whether the defendant believed in good faith that the expenditure would benefit the union. *Id.* at 671.

In *Butler*, we said the same thing:

> Authorization from and benefit to the union are the controlling lodestars to determine whether a defendant acted with the fraudulent intent to deprive the union of its money. *See United States v. Floyd*, 882 F.2d 235, 239–41 (7th Cir.1989). Accordingly, we have held that a union official charged with embezzling union funds, pursuant to 29 U.S.C. § 501(c), lacks the requisite criminal intent when the evidence establishes that he had a good-faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union. *See United States v. Ottley*, 509 F.2d 667, 671 (2d Cir.1975); . . .

Subsequent decisions of this Court state the rule as follows:

> Because embezzlement is a specific intent offense, a defendant may not be said to have a fraudulent intent when there is a finding that he has a "good-faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union." *United States v. Butler*, 954 F.2d 114, 118 (2d Cir.1992). *See also United States v. Ottley*, 509 F.2d 667, 671 (2d Cir.1975).

*See, e.g., United States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL–CIO*, 978 F.2d 68, 72 (2d Cir.1992).

Following the teachings of these cases, the court below charged as follows:

> In making a determination of whether a defendant acted with specific criminal intent to deprive the Plan or a fund connected therewith of the use of its funds, you may consider the following:
>
> (1) whether or not the alleged use of the funds of the Plan was authorized and whether or not that defendant had a good faith belief that such use was authorized or would be authorized; and
>
> (2) whether or not that defendant had a good faith belief that such use of the funds of the Plan benefited the participants and beneficiaries of the Plan.

The Government has a burden of proving that a defendant acted with the required intent with respect to the elements of the respective definitions of embezzlement, stealing and abstracting or converting to his own use or the use of another, which definitions I reviewed earlier. Also, as is the case in Count One, good faith is an absolute defense to this charge. Accordingly, the Government must prove in the case of each defendant that:

> (1) that defendant did not believe in good faith that the use the Plan's funds charge in the indictment benefited or would benefit the Plan participants and beneficiaries; or
>
> (2) that defendant did not believe in good faith that his or its use of the funds was authorized or would be authorized by the Plan's representatives.

■ This charge correctly stated the several items of proof that the Government had to satisfy in order to secure a conviction. If the Government's proof failed as to either item, the jury was instructed to acquit. There was no error here.

■ We also find no merit in Mezzetta's challenge to his conviction of violating 18 U.S.C. § 1027, which provides in substance as follows:

> Every person subject to a requirement to file any description or report or to certify any information therefor under this subchapter . . . shall maintain records on the matters of which disclosure is required which will provide in sufficient detail the necessary basic information and data from

which the documents thus required may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions....

Mezzetta contended below that the portfolio summaries he submitted to Roofers did not fall within the scope of section 1027. The district court correctly rejected this contention as contrary to section 1027's requirement that covered pension plans retain "records ... which will provide in sufficient detail the necessary basic information and data from which the documents [the plan must file] may be verified, explained, or clarified, and checked for accuracy and completeness[.]"

One of the basic goals of ERISA is the protection of the interests of pension plan participants through mandatory disclosure of financial information. 29 U.S.C. § 1001(b). The requirement that a covered plan complete and file Form 5500 each year is an example of such disclosure—a plan completing the Form must list its assets, liabilities, and other pertinent information. The investment portfolio summaries furnished such a plan by its investment advisor provide "necessary basic information" from which the plan's ERISA-mandated financial disclosures—including those requisite to the completion of Form 5500—can be verified, explained, etc. *See United States v. Sarault*, 840 F.2d 1479, 1482–85 (9th Cir.1988); *United States v. Martorano*, 767 F.2d 63, 65–66 (3d. Cir.), *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985); *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 917–18 (6th Cir.), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

█ Mezzetta now contends that the district court should have asked the jury to decide whether GB Resources' reports were required to be kept by the Roofers under ERISA. In support of this late argument, he cites *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), in which the Court held that the "materiality" element of a perjury charge under 18 U.S.C. § 1001 (prohibiting material misrepresentations in matters involving government agencies) presents a jury question. *Gaudin*,

515 U.S. at 523, 115 S.Ct. at 2320. The *Gaudin* Court stated that the Constitution "require[s] criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 510, 115 S.Ct. at 2313 (citing *Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 2080–81, 124 L.Ed.2d 182 (1993)). While we, of course, do not disagree with this general legal principle, we find no support in it for Mezzetta's claim of plain error.

█ Materiality is not an element of a section 1027 violation. Whether GB Resources' portfolio reports were records within the scope of 29 U.S.C. § 1027 was a matter of statutory interpretation and legal definition properly decided by the court, which is the "final author[ity] on issues of statutory construction." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). *See United States v. Santiago*, 528 F.2d 1130, 1135 (2d Cir.1976); *United States v. Louisiana–Pacific Corp.*, 754 F.2d 1445, 1447 (9th Cir.1985); *United States v. Wilson*, 720 F.2d 608, 609 n. 2 (9th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984). Once the district court held that the portfolios' contents fell within the coverage of section 1027, a ruling in which we concur, any willful falsehoods in those documents violated the statute.

Mezzetta also argues relative to the count alleging that he caused false statements to be made in the IRS Form 5500: first, that the district court instructed the jury only on the traditional form of aider and abettor liability embodied in 18 U.S.C. § 2(a)—and not on the "willful causation" form of secondary liability embodied in 18 U.S.C. § 2(b); second, that given the uncontested absence of a guilty principal, the trial evidence was insufficient to sustain conviction under a section 2(a) aider and abettor theory; and, third, that even if the jury was properly instructed on section 2(b) "causer" liability, the evidence still does not support the jury's verdict on this count. Although the district court's jury instruction may have contained some unnec-

essary language, we find no merit in the foregoing contentions.

■ The district court instructed the jury that Mezzetta was charged with "aiding and abetting and causing to be made false statements of fact in federal tax forms" in violation of 18 U.S.C. §§ 2 and 1027. After quoting the pertinent language in section 1027, the court recited the text of subsection 2(a) and described in some detail the findings the jury would have to make in order to find a defendant guilty under that subsection—among which was a finding that a principal committed a criminal offense. *See United States v. Elusma*, 849 F.2d 76, 78 (1988). Because Mezzetta was charged only with "causing" a false statement to be made—a species of secondary liability that does not require proof of a guilty ·principal—the court's discussion of the more common form of aiding and abetting was unnecessary. However, if this was error, it was harmless. The court quickly got back on track by instructing the jury that:

> to sustain its burden of proof for the crime of aiding and abetting and causing to be made false statement[s] of fact ... as charged in Count Four ... the Government must prove ... beyond a reasonable doubt: first, that the [Roofers'] Plan was a pension benefit plan within the meaning of ERISA; second, that [Mezzetta] knowingly made or caused to be made ·a false statement or representation of fact in a Form 5500 annual report relating to the plan, or that [Mezzetta] knowingly concealed, covered up, or failed to disclose, or caused to be concealed, covered up or not disclosed, in such Form 5500 annual report any fact the disclosure of which is required by ERISA.

This language clearly conformed to the indictment and gave the jury a correct understanding of the Government's burden under sections 2(b) and 1027. So long as "the jury [i]s armed with a correct statement of the applicable legal principles" governing "causer" liability under section 2(b), a misplaced or erroneous instruction on "aider" liability under section 2(a) will not preclude a finding of guilt under section 2(b). *See United*

*States v. Ruffin*, 613 F.2d 408, 416 (2d Cir. 1979).

■ We turn, then, to Mezzetta's alternative contention that the evidence was insufficient to sustain his conviction under section 2(b). A criminal defendant challenging a conviction on evidentiary grounds "bears a very heavy burden." *United States v. Rosenthal*, 9 F.3d 1016, 1024 (2d Cir.1993). We must affirm a conviction if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ Mezzetta asserts that the government did not produce evidence from which the jury could find beyond a reasonable doubt that he willfully "caused" Belush to file a false Form 5500 with the Department of Labor. We disagree. The proof at trial showed that Mezzetta knew Belush was preparing Roofers' Form 5500 for submission to the government and using GB ·Resources' portfolio reports for that purpose. Mezzetta knew that the portfolio reports were false and misleading. Belush testified that he repeatedly sought additional information for the express purpose of completing the Form and that Mezzetta was unresponsive. Belush made it clear to Mezzetta that if Mezzetta persisted in his recalcitrance, Belush would be obliged to complete and file the 1988 Form 5500 "based on what he had," namely GB Resources' false and misleading portfolio reports. That is what Belush did. The Government offered adequate proof that Mezzetta willfully caused Belush to file an inaccurate Form 5500, contrary to section 2(b). *See United States v. Concepcion*, 983 F.2d 369, 383–84 (2d Cir.1992); *United States v. Heyman*, 794 F.2d 788, 790–91 (2d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986).

■ Mezzetta next contends that the district court erred in sustaining the Government's objection to the two point base level increase recommended pursuant to U.S.S.G. § 3B1.1(c) in the Presentence Report and imposing instead a four point increase pursuant to U.S.S.G. § 3B1.1(a). The district

court imposed the four point increase because it found that Mezzetta was an "organizer or leader" and that his criminal activity while not. involving "five or more [knowing] participants," was "otherwise extensive" under section 3B1.1(a). Our opinion in *United States v. Carrozzella,* 105 F.3d 796 (2d Cir. 1997), sets forth a three part test to guide the application of section 3B1.1(a). In deciding whether a defendant's criminal activity was "otherwise extensive," the sentencing court should determine: "(i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme." *Id.* The sentencing in the instant case was in complete accord with *Carrozzella.* The district court identified one other knowing participant (Nolan) and at least eight unknowing participants whose services were peculiar and necessary to the scheme, including Roofers' accountant, the Bank officers, the Trust "co-fiduciary," and the various lawyers involved along the way. In short, we see no error in the district court's holding that this scheme satisfied the requirements of section 3B1.1(a) and affirm the four point enhancement provided for by that section.

■ Mezzetta's final contention is that the district court erred in calculating the damages attributable to him. The principal amount, $1,598,300, is uncontested. This includes the $600,000 that Mezzetta and Nolan embezzled via the Trust–Gotham note and the unauthorized withdrawals they made from the Trust. The district court refused to offset the losses by $455,000, the sum realized by Roofers from the sale of the 82nd Street property, and this decision likewise is not challenged on appeal. However, the district court included in the loss the unpaid interest and penalties payable on the Trust–Gotham note, and Mezzetta appeals this portion of his sentence.

■ It is true, as Mezzetta contends, that a sentencing court should not add to the loss amount its estimate of the interest or other investment return the victim might have earned had the money not been taken from him. This basic rule is stated in Guidelines section 2B1.1, Application Note 2 and in section 2F1.1, Application Note 7. The district court considered those Notes but concluded that they did not apply where,. as here, the money stolen included both principal and agreed-upon interest. *See United States v. Allender,* 62 F.3d 909, 917 (7th Cir.1995), *cert. denied,* 516 U.S. 1076, 116 S.Ct. 781, 133 L.Ed.2d 732 (1996); *see also United States v. Henderson,* 19 F.3d 917, 928–29 (5th Cir.), *cert. denied,* 513 U.S. 877, 115 S.Ct. 207, 130 L.Ed.2d 137 (1994); *United States v. Goodchild,* 25 F.3d 55, 66 (1st Cir.1994); *United States v. Lowder,* 5 F.3d 467, 470–71 (10th Cir.1993); *United States v. Jones,* 933 F.2d 353, 354 (6th Cir.1991). Like the district court, we find these authorities persuasive, and we reject Mezzetta's claim of error.

## CONCLUSION

We have considered all of the appellants' arguments and, finding none to have merit, we affirm.