**UNITED STATES of America,**
**Appellee,**

v.

**Robert J. McCARTHY, Defendant–**
**Appellant.**

**Docket No. 00–1639.**

United States Court of Appeals,
Second Circuit.

Argued June 6, 2001.

Decided Nov. 16, 2001.

---

Jason Brown, Holland & Knight, LLP, (Roseann Bassler, on the brief) New York, NY, for Defendant–Appellant.

Karl Metzner, Assistant United States Attorney, (Mary Jo White, United States Attorney for the Southern District of New York, Gary Stein, Assistant United States Attorney, on the brief) New York, NY, for Appellee.

Before McLAUGHLIN and POOLER, Circuit Judges, and KOELTL, District Judge *.

POOLER, Circuit Judge.

Robert McCarthy appeals from his conviction on multiple counts of embezzlement from employee benefit plan funds, money laundering, conspiracy to create false documents that the Employee Retirement Income Security Act ("ERISA") requires and embezzlement of bankruptcy assets. On appeal, McCarthy primarily raises two challenges to his verdict. First, he argues that the evidence supporting his money laundering convictions is insufficient because the government failed to prove the money laundering involved the proceeds of a separate, completed criminal activity.

Second, McCarthy argues the district court improperly instructed the jury as to his good faith defense by failing to give the specific good faith charge we approved in *United States v. Nolan,* 136 F.3d 265 (2d Cir.1998). Alternatively, McCarthy asks us to reverse his sentence and remand for resentencing, with instructions to the district court to group his money laundering and embezzlement charges. He also seeks to have the district court apply the embezzlement sentencing guideline rather than the more onerous money laundering sentencing guideline. For the reasons given below, we affirm both the conviction and sentence.

## BACKGROUND

McCarthy, a certified public accountant, opened his own practice in 1986, specializing in distressed companies and turnaround situations. Lloyd's Shopping Centers Inc. ("Lloyd's") fell squarely within the parameters of McCarthy's practice. Lloyd's owned two combination supermarket and department stores in Orange County, New York. Faltering in the face of competition from larger retailers, Lloyd's filed for protection from its creditors under Chapter 11 of the U.S. Bankruptcy Code in December 1992. By May 1994, Lloyd's closed its Newburgh store. Lloyd's hired McCarthy in October 1994 as a consultant to help the company emerge from bankruptcy protection. Shortly after hiring McCarthy as a consultant, Lloyd's management asked McCarthy to become chief executive officer of the publicly held corporation. McCarthy's compensation package included the right to purchase two options which would entitle him to buy, in total, one million shares of Lloyd's stock—

---

* The Honorable John G. Koeltl, United States District Court Judge for the Southern District of New York, sitting by designation.

enough to make him the company's majority shareholder .[1]

During McCarthy's tenure, the following small group managed Lloyd's: McCarthy, Edmund Lloyd, the company's founder; William Kelder, the treasurer; and Richard G. Hickey, an attorney and member of the board of directors. Hickey was a partner in Lloyd's outside counsel, the New York City law firm of Foley, Hickey, Gilbert & O'Reilly. Hickey's law partner, Terrence O'Reilly, also frequently consulted with McCarthy.

At the time McCarthy joined the company in late 1994, a critical bankruptcy court deadline loomed. Lloyd's risked being liquidated unless the bankruptcy court confirmed its reorganization plan during a December 28, 1994, hearing. As a condition of confirmation, Lloyd's needed to reach repayment agreements with the bulk of its creditors. Lloyd's made agreements with several key creditors except its largest one, Orange County, which refused to compromise a $420,000 tax lien. McCarthy explored paying off the loan using money from the Lloyd's defined benefit plan ("Pension Plan") and from Lloyd's defined contribution plan ("401(k) Plan") (collectively, the "Plans"). O'Reilly and others advised McCarthy that the proposal would violate ERISA. Unable to use the Plans to pay off the lien before the December 28 court deadline, McCarthy settled on an alternate course of action. McCarthy used funds from the bankruptcy estate of Discount Harry, Inc., a New Jersey corporation he controlled as the disbursing agent. To accomplish this, McCarthy opened a personal checking account in his own name at the Bank of New York and directed a $420,000 wire transfer from the Discount Harry disbursing account into his

newly opened account. McCarthy's check, drawn on this account, was used to pay off the lien.[2] The bankruptcy court approved the reorganization plan, and Lloyd's was able to emerge from bankruptcy.

The issue of the Plans, however, was not settled. McCarthy suggested moving the assets from both Plans and placing them into a holding account, ostensibly a makeshift measure while he explored better investment options. In late January 1995, Lloyd's transferred $1,423,844.46 from the Pension Plan and $723,024.05 from the 401(k) Plan into trust accounts at the Bank of New York, with Kelder as trustee. Shortly after the plan funds were in the trust accounts, McCarthy signed a wire transfer ordering $300,000 moved from the Pension Plan trust account to the account of Alliance Capital Design Group, Ltd. ("Alliance") at NatWest Bank in New York. Alliance was a corporation that McCarthy controlled and used for another of his business ventures.

Lloyd's financial problems continued. An especially pressing concern was a $2.4 million mortgage that Fleet Bank held against both Lloyd's properties. The mortgage was particularly burdensome to Lloyd's because of high mortgage payments and escalating penalty payments that Lloyd's had agreed to in March 1995 to prevent foreclosure. Further, extinguishing the mortgage against the Newburgh property would allow Lloyd's to lease the property to another retailer. McCarthy was interested in using money from the Plans to pay off the Fleet mortgage. He suggested a number of different ways for doing so to O'Reilly during the late winter and spring of 1995. O'Reilly testified that he shot down each of the

---

1. While McCarthy bought one option for $50,000, he did not exercise it.

2. McCarthy replaced the funds in the Discount Harry account with loans from family and friends.

plans as violating ERISA in some manner. O'Reilly also testified that he told Hickey, his law partner and Lloyd's director, that any plan to pay down the mortgage using the trust account funds would be considered a prohibited transaction under ERISA. Hickey, however, testified that he never discussed paying down the Fleet mortgage with O'Reilly, or advised McCarthy that ERISA would prohibit the transaction.

McCarthy eventually used money from the Plans to extinguish the Fleet Bank mortgage. To obtain the money from the trust accounts, Lloyd's trustee Kelder forwarded a letter on Alliance letterhead to the Bank of New York, which held the trust accounts. The letter stated the monies were needed to acquire a mortgage which would earn interest at the rate of 8 percent. Kelder obtained certified checks in the amount of $1,115,000 from the Pension Plan trust account and $635,000 from the 401(k) Plan to pay down the mortgage. McCarthy opened an account at Fleet Bank in the name, "Lions Capital Design Group, Ltd"[3] and deposited both checks into the Lions account, for a total account balance of $1,750,000.

Using the money in both the Alliance and Lions accounts, McCarthy paid off the Fleet mortgage. Lloyd's never executed a new mortgage protecting the Plans' interest. McCarthy also used money from the Alliance and Lions accounts for a variety of other financial transactions, benefitting both Lloyd's and other of McCarthy's business ventures. Lloyd's employees, meanwhile, began asking why they had not yet received their quarterly 401(k) statements. McCarthy and Kelder created false 401(k) statements for distribution to the employees.

Lloyd's fired McCarthy on February 1, 1996. After his termination, McCarthy sued Lloyd's and Edmund Lloyd, individually, for money damages and an injunction directing his reinstatement as an officer and the enforcement of the stock option agreement. In 1998, James Lloyd, as trustee of the Pension Plan, sued McCarthy, Alliance, Kelder and the Bank of New York alleging embezzlement of $300,000 from the Pension Plan. The government's multi-count indictment against only McCarthy followed on December 18, 1998. A jury trial took place from September 23, 1999, until October 13, 1999. O'Reilly testified at trial for the government pursuant to a non-prosecution agreement. Hickey testified for the government on rebuttal pursuant to a compulsion order after receiving immunity from prosecution. Kelder pleaded guilty to one count of conspiracy to distribute false ERISA documents, and he testified for the government pursuant to his plea agreement. Testifying at his trial as the sole defense witness, McCarthy maintained he had a good faith belief that each transaction at issue was proper. The jury convicted McCarthy of three counts of embezzlement of employee benefit plan funds, in violation of 18 U.S.C. § 664; ten counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i); seven counts of money laundering in violation of 18 U.S.C. § 1957; one count each of conspiracy to create and creating false documents required by ERISA, in violation of 18 U.S.C. §§ 371 and 1027, respectively; and one count of embezzlement of bankruptcy assets in violation of 18 U.S.C. § 153. The district court sentenced McCarthy to 78 months imprisonment, three years supervised release, a $1,200

---

**3.** McCarthy apparently intended to open the account in the name of Alliance, but the name

"Lions" was inserted by clerical error.

special assessment, no fine and restitution of $1.6 million. McCarthy now appeals.

## DISCUSSION

### I. Sufficiency of the evidence

McCarthy contends that the government presented insufficient evidence to support the seventeen money laundering charges because he made no payment from the proceeds of a criminal activity. We review an allegation of insufficient evidence *de novo*. *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000). "[T]he court must be careful to avoid usurping the role of the jury." *Id.* (*quoting United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir.1999)). A defendant challenging his verdict on sufficiency grounds bears a "heavy burden." *United States v. Bala*, 236 F.3d 87, 93 (2d Cir.2000) (citation omitted). "[W]e view the evidence presented in the light most favorable to the government, and we draw all reasonable inferences in its favor." *Autuori*, 212 F.3d at 114. Thus, we must affirm McCarthy's conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

The jury convicted McCarthy of money laundering under both 18 U.S.C. § 1956(a)(1)(B)(i) and 18 U.S.C. § 1957. Under Section 1956(a)(1)(B)(i), a financial transaction is money laundering if the defendant acts "knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Section 1957 makes it a crime to "knowingly engage[ ] . . . in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived

from specified unlawful activity." 18 U.S.C. § 1957(a). "Criminally derived property" is "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). Both money laundering statutes define "specified unlawful activity" to include embezzlement of employee benefit plan funds in violation of 18 U.S.C. § 664. 18 U.S.C. §§ 1956(c)(7)(A), 1957(f)(3); 1961(1). Section 664 makes it a crime for anyone to embezzle "any of the moneys, funds, securities, premiums, credits, property or other assets of any employee welfare benefit plan . . ." 18 U.S.C. § 664.

Neither statute defines "proceeds," leaving open the door for McCarthy's argument here. He argues that the government did not present sufficient evidence to support his money laundering convictions because it "never established an essential element of money laundering: the subsequent use of proceeds derived from a separate and already completed offense." Under defendant's theory, there are no proceeds in the case at bar because there is no clear delineation between McCarthy's embezzlement of the Plans' funds and his spending the Plans' funds on corporate expenses. Without proceeds there can be no money laundering. To buttress his position, McCarthy contends that if he merely moved the Plans' funds into the Alliance and Lions accounts but never again touched the money, then there would be no crime. The government argues that when McCarthy moved the money from the Plans' trust accounts into accounts he controlled, the crime of embezzlement was complete. When McCarthy paid out the money for corporate expenses, the government continues, he laundered the proceeds of the completed embezzlement.

We think the government has the better argument. To prevail under the

money laundering statutes, the government must show that defendant "(1) acquire[d] the proceeds of a specified unlawful activity and then (2) engage[d] in a financial transaction with those proceeds." *United States v. Napoli,* 54 F.3d 63, 68 (2d Cir.1995). We agree with the Courts of Appeals for the First, Third and Fourth Circuits, which hold that funds become proceeds when they are "derived from an already completed offense, or a completed phase of an ongoing offense." *United States v. Conley,* 37 F.3d 970, 980 (3d Cir.1994); *see also United States v. Richard,* 234 F.3d 763, 770 (1st Cir.2000) *United States v. Butler,* 211 F.3d 826, 829 (4th Cir.2000), *cert. denied,* 531 U.S. 1149, 121 S.Ct. 1091, 148 L.Ed.2d 965 (2001); *United States v. Morelli,* 169 F.3d 798, 805–09 (3d Cir.1999). Thus, when the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction. *See Morelli,* 169 F.3d at 805–06 (funds became proceeds of fraud when removed from the control of the victims and placed under control of defendants); *see also United States v. Allen,* 76 F.3d 1348, 1361 (5th Cir.1996) ("fraudulent scheme produces proceeds at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators").

■ Our case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together. We have held:

> [T]here is no inherent connection between the crime of embezzlement and the crimes of money laundering by structuring and concealing financial transactions; they are separate offenses and not part of one continuous offense. One may embezzle union funds without laundering the money or structuring financial transactions with it; one may also structure cash transactions or launder money without having acquired the funds through embezzlement.

*United States v. Holmes,* 44 F.3d 1150, 1154 (2d Cir.1995); *see also United States v. Cefaratti,* 221 F.3d 502, 510–11 (3d Cir. 2000) (deposit of fraudulently obtained student loan checks is money laundering because the checks became criminally derived property once endorsed); *Butler,* 211 F.3d at 830 (funds became proceeds when given to third party to hold, and the subsequent transactions are money laundering). Here, embezzlement is the predicate crime. That crime was complete when McCarthy transferred the plan funds from the Lloyd's trust accounts into accounts under McCarthy's control. *See United States v. Andreen,* 628 F.2d 1236, 1241 (9th Cir.1980) (embezzlement "encompasses the fraudulent appropriation of the property of another by one in lawful possession thereof"); *see also Conley,* 37 F.3d at 980–81 (underlying crime and money laundering both exist even if there is "some overlap in the acts" constituting the crimes). Because McCarthy used the Alliance and Lions accounts to conceal the true source of the money, the checks he wrote to creditors from those accounts constitute money laundering. Contrary to McCarthy's assertion, even if his actions stopped after he transferred the Plans' trust account funds to accounts under his control, he would have completed the crime of embezzlement. *See Holmes,* 44 F.3d at 1154. Whether the government would have chosen to prosecute that crime is another matter. The money laundering occurred when McCarthy "engage[d] in a financial transaction with [ ] proceeds," using the embezzled funds to pay corporate expenses. *Napoli,* 54 F.3d at 68. Thus, there is sufficient evidence for a rational trier of fact to have "found the essential

elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

## II Jury instructions

 McCarthy next challenges the district court's jury charge regarding his good faith defense to the embezzlement charges. We review jury instructions *de novo. United States v. Abelis,* 146 F.3d 73, 82 (2d Cir.1998). Criminal defendants have the "right to a charge which reflects the defense theory." *United States v. Evangelista,* 122 F.3d 112, 116 (2d Cir. 1997) (citation omitted). On appeal, defendant bears the burden of proving both that (1) the charge he requested correctly represented the law; and (2) the jury charge that the district court gave was erroneous and prejudicial. *Abelis,* 146 F.3d at 82. "A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law." *Id.* at 82–83 (citation omitted). "[D]efendants are not necessarily entitled to have the exact language of the charge they submitted to the district court read to the jury." *Evangelista,* 122 F.3d at 116 (citation omitted). "Indeed, defendants are entitled only to have instructions presented which adequately apprise the jury of the elements of the crime charged and their defense—assuming of course that their defense theory did have a basis in law and in the evidence." *Id.* (internal quotation marks and citations omitted).

 McCarthy requested a jury instruction that we approved in *United States v. Nolan,* 136 F.3d 265 (2d Cir. 1998). In *Nolan,* the defendants were charged with conspiracy to embezzle and embezzlement of pension plan assets in violation of 18 U.S.C. § 664. *Nolan,* 136 F.3d at 267. The *Nolan* court noted that the language of Section 664 "is almost identical with that of 29 U.S.C. § 501(c), which prohibits the embezzlement of union funds. These two sections therefor are interpreted in the same manner insofar as the conduct they prohibit is involved." [4] *Id.* at 269. In determining criminal intent under Section 501(c), we have held there is no fraudulent intent when the defendant had "a good-faith belief both that the funds were expended for the union's benefit and that the expenditures were authorized (or would be ratified) by the union." *United States v. Butler,* 954 F.2d 114, 118 (2d Cir.1992) (*citing United States v. Ottley,* 509 F.2d 667, 671 (2d Cir.1975)). Thus, when instructing a jury in a § 501(c) case, the issues of whether the union authorized the transfer and whether the union benefited from that transfer are relevant and should be included in the jury charge. *Butler,* 954 F.2d at 118–19; *Ottley,* 509 F.2d at 671.

Based on our precedent, the district court in *Nolan* charged, in pertinent part:

> In making a determination of whether a defendant acted with specific criminal intent to deprive the Plan or a fund connected therewith of the use of its funds, you may consider the following:

---

4. Section 501(c) of the labor law punishes: "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly ..." 29 U.S.C. § 501(c).

Section 664 of the criminal law punishes: "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith ..." 18 U.S.C. § 664.

(1) whether or not the alleged use of the funds of the Plan was authorized and whether or not that defendant had a good faith belief that such use was authorized or would be authorized; and

(2) whether or not that defendant had a good faith belief that such use of the funds of the Plan benefited the participants and beneficiaries of the Plan.

The Government has a burden of proving that a defendant acted with the required intent with respect to the elements of the respective definitions of embezzlement, stealing and abstracting or converting to his own use or the use of another, which definitions I reviewed earlier. Also, as is the case in Count One, good faith is an absolute defense to this charge. Accordingly, the Government must prove in the case of each defendant that:

(1) that defendant did not believe in good faith that the use [of] the Plan's funds charge[d] in the indictment benefited or would benefit the Plan participants and beneficiaries; or

(2) that defendant did not believe in good faith that his or its use of the funds was authorized or would be authorized by the Plan's representatives.

*Nolan*, 136 F.3d at 270. We approved the instruction in the context of Section 664 criminal liability, finding it "correctly stated the several items of proof that the Government had to satisfy in order to secure a conviction." *Id.*

McCarthy requested the district court give the *Nolan* charge to his jury. Instead of using exactly the same instruction, the district court instructed the jury:

In making a determination whether the defendant acted with specific criminal intent to deprive the plan or fund connected therewith of the use of its funds, you may consider the following:

1. Whether or not the alleged use of the funds of the plan were authorized and whether or not the defendant had a good-faith belief that such use was authorized by law; and

2. Whether or not the defendant had a good-faith belief that such use of the funds of the plan benefited the participants and beneficiaries of the plan.

\* \* \*

Good faith is an absolute defense to this charge. Accordingly, the government must prove that:

1. The defendant did not believe in good faith that the use of the plan's funds charged in the indictment benefited or would benefit the plan participants and beneficiaries; or

2. The defendant did not believe in good faith that his use of the funds was authorized by law.

This is essentially the same charge as the one in *Nolan*, except the district court here required the government to disprove McCarthy had a good faith belief his actions were or would be authorized by law, rather than by plan representatives. McCarthy argues that this slight variation is reversible error.

 Jury charges are rarely rote recitations dictated to lower courts from higher ones. This is because "a charge that is adequate and proper in one case may not play the same role in another case involving a different set of facts." *United States v. Regan*, 937 F.2d 823, 828 (2d Cir.1991). It naturally follows that "[t]he district court must tailor its instructions to the facts of the case before it." *Id.* McCarthy's factual situation is distinguishable from the defendant in *Nolan*, because

in *Nolan* there were union members who could have authorized the defendant's transactions. *Nolan*, 136 F.3d at 267–68; *see also United States v. Stockton*, 788 F.2d 210, 217 (4th Cir.1986) (the union is the owner of its funds, thus, "[a]n appropriation or expenditure of union funds is therefore unauthorized if it is done without the permission of *the union*, even if it is approved by a superior union official") (emphasis in original). In McCarthy's case, no such outside source for authorization existed. McCarthy, with signature authority over the Plans' funds, and Kelder, as the Plans' trustee, were the only parties who could have authorized the suspect transactions. Both were charged criminally for acts related to the funds use, and Kelder pleaded guilty to creating false documents required by ERISA. McCarthy did not raise a valid good faith defense by arguing he believed in good faith that Kelder had authorized use of the funds. Rather, McCarthy had to believe, in good faith, that the use of the funds was authorized by law. The district court thus correctly instructed the jury.

█ McCarthy's argument also fails because ERISA makes clear that the transactions at issue could not have been authorized without the approval of the Secretary of the Treasury. In enacting ERISA, Congress clearly intended to protect workers' retirement benefits. 29 U.S.C. § 1001. The assets of an ERISA-protected plan "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries...." 29 U.S.C. § 1103(c)(1). Trustees cannot authorize transactions prohibited under ERISA without an exemption from the Secretary of the Treasury. 29 U.S.C. § 1108. Further, "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated" by the plan participants, except under certain circumstances not relevant here. 29 U.S.C. § 1056(d)(1). We join the Ninth Circuit in concluding:

"[i]n light of this anti-alienation principle and our understanding of the purposes of ERISA generally ... those who embezzle from ERISA pension funds cannot argue that their otherwise illegal transactions were 'authorized' by the plan participants because the participants themselves lack the legal power to 'authorize' such a diversion of pension monies. Consequently, when a pension fund embezzler argues that the plan participants 'authorized' the embezzlement, it is little different from arguing that complete strangers 'authorized' the illicit transactions. This sort of evidence is simply irrelevant to the scienter inquiry required to support a conviction under 18 U.S.C. § 664."

*United States v. Mett*, 178 F.3d 1058, 1068 (9th Cir.1999). McCarthy's argument that "he believed in good faith that the use of the funds was authorized or would be authorized" fails because neither the Plans' trustees nor their participants could authorize the transactions. Therefore, McCarthy could prevail only by showing he had a good faith belief his actions were authorized by law. The district court correctly instructed the jury.[5]

---

**5.** Because we need not do so to decide the case before us, we decline the government's invitation to adopt the Ninth Circuit's approach in *Mett* that rejects inclusion of a "participant benefit" component to a good-faith instruction in Section 664 cases. *See*

*Mett*, 178 F.3d at 1068 (authorization and participant benefit jury charges inappropriate in Section 664 cases because the plan "participants themselves lack the legal power to authorize such a diversion of pension monies").

Finally, it is clear the *Nolan* court did not squarely face the issue presented to us here, and thus the *Nolan* instruction does not stand as the only proper good faith instruction in a Section 664 case. Appellants in *Nolan* challenged the instruction on other grounds, and the government, having prevailed at trial, defended the charge as given. Issues "neither contested by the parties, nor addressed by the panel" do not create binding precedent. *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 49 (2d Cir.2000); *see also Webster v. Fall*, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). The instruction given by the district court in McCarthy's case is correct.

### III Perjured testimony

We dispense quickly with McCarthy's claim that we should reverse the verdict and grant him a new trial because the government knowingly permitted the introduction of perjured testimony. We lack jurisdiction to consider this claim.

Under Fed.R.Crim.P. 33, a district court "[o]n a defendant's motion" may grant defendant a new trial if one is required in the interest of justice. Fed. R.Crim.P. 33. If defendant makes a Rule 33 motion based on newly discovered evidence, he must do so within three years of the verdict. Fed.R.Crim.P. 33. If defendant makes the motion on any other grounds, he must do so seven days after the verdict or within such further time the district court sets. *Id.* When a motion for a new trial is not timely, and "there is no suggestion that the motion is based on newly discovered evidence," the motion is deemed untimely, and we lack jurisdiction

to consider it. *United States v. Moreno*, 181 F.3d 206, 212 (2d Cir.1999), *cert. denied* 528 U.S. 977, 120 S.Ct. 427, 145 L.Ed.2d 334 (1999). Jurisdiction is wanting here because there is no evidence in the record suggesting McCarthy made a motion within seven days after the verdict and there is no hint of newly discovered evidence.

McCarthy's claim would fail even if we were to reach the merits of his argument. A new trial based on "allegations of perjured testimony should be granted only with great caution and in the most extraordinary circumstances." *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir.2000) (quotation marks and citations omitted), *cert. denied*, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001). To prevail, a defendant must show "(i) the witness actually committed perjury; (ii) the alleged perjury was material; (iii) the government knew or should have known of the alleged perjury at [the] time of trial, and (iv) the perjured testimony remained undisclosed during trial." *Id.* (internal quotation marks and citations omitted).

McCarthy argues that the government knowingly presented "false and misleading testimony" from both O'Reilly and Hickey. According to McCarthy, O'Reilly lied when he testified that he and Hickey advised McCarthy that paying down the Fleet mortgage using the Plans' funds was barred under ERISA. McCarthy also alleges Hickey lied when testifying that Hickey believed Alliance to be independent from McCarthy. However, defense counsel addressed the conflicting testimony on cross examination. The jury was entitled to weigh the evidence and decide the credibility issues for itself. *Zichettello*, 208 F.3d at 102; *United States v. Joyner*, 201 F.3d 61, 82 (2d Cir.2000) ("cross-examination and jury instructions regarding witness credibility will normally purge the

taint of false testimony"). As nothing in the record indicates the alleged perjury remained undisclosed during trial, the perjury claim fails. *Zichettello*, 208 F.3d at 102.

## IV Sentencing issues

■■■ McCarthy argues that the district court erred in sentencing him in three ways: by failing to group the pension embezzlement and money laundering counts of conviction together; by not recognizing the facts of his case fall outside the heartland of money laundering crimes and require a downward departure; and by not exclusively applying the guidelines for pension embezzlement instead of the guidelines for money laundering. We review the district court's legal interpretations *de novo*, and its findings of fact for clear error. *United States v. Napoli*, 179 F.3d 1, 6 (2d Cir.1999), *cert. denied* 528 U.S. 1162, 120 S.Ct. 1176, 145 L.Ed.2d 1084 (2000).

### A. Grouping

■■■ In order to receive a lower sentence, McCarthy asked the district court to group the pension embezzlement and money laundering convictions. With respect to the pension embezzlement counts, the district court at sentencing set an adjusted offense level of 22. For the money laundering counts, the district court set an adjusted offense level of 26. The district court then refused defendant's motion to group the counts together, finding "there are separate victims · and separate offenses." It set the combined offense level for the two groups at 28, yielding a sentencing guidelines range of imprisonment of 78 to 97 months. If McCarthy had been successful in his grouping request, the sentencing guidelines range of imprisonment would have been 41 to 51 months.

Pursuant to the Sentencing Guidelines, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." U.S.S.G. § 3D1.2. Counts involve substantially the same harm when they "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." *Id.* at § 3D1.2.(b). McCarthy argues that the district court should have grouped together the money laundering transactions and the pension embezzlement offenses because the transactions were part of a common scheme or plan and because the direct victims of both crimes were the same, the Plans and their participants.

This case falls squarely within our holding in *United States v. Napoli*, where we stated:

> The "victims" of fraud counts are those persons who have lost money or property as a direct result of the fraud. The "victim" of money laundering is, by contrast, ordinarily society at large. Society is harmed when, for example, the ill-gotten gains from a criminal enterprise are allowed to be used for profit, the sources of these funds are concealed from police investigation or criminals are allowed to disperse capital from lawfully operating economic institutions to [other] criminals in and out of the country. Because we find that Napoli's fraud and money laundering counts involved different harms to different victims, they cannot be grouped under [§ 3D1.2(b) ].

*Napoli*, 179 F.3d at 7–8 (quotation marks and citations omitted, first alteration in the original); *see also United States v. Sabbeth*, 262 F.3d 207, 221 (2d Cir.2001) (declining to group money laundering and fraud offenses because the two were not "highly interwoven"). Similarly, McCar-

thy's crimes here had two sets of victims. The victims of the pension embezzlement are Lloyd's employees who had pension and 401(k) plan savings. The victim of the money laundering is society at large, hurt by McCarthy's use of the embezzled funds.

McCarthy relies on a *Napoli* footnote stating: "[w]e need not decide here whether we agree with those circuits that have held that the function of money laundering can sometimes be so highly interwoven into a fraud scheme that the fraud victim is the direct victim of the money laundering as well, and the counts should be grouped together." *Napoli,* 179 F.3d at 8 n. 3 (citations omitted). He urges us to find his actions have been "so highly interwoven" as to require grouping. However, like the *Napoli* court, we find we need not reach the issue here. McCarthy's acts of embezzlement and money laundering were not so interlaced that "the fraud victim is the direct victim of the money laundering as well." *Id.* The cases upon which McCarthy relies are distinguishable because in those cases defendants, for the most part, used the laundered money to keep their original fraud schemes going. *See United States v. Walker,* 112 F.3d 163, 167 (4th Cir.1997); *United States v. Wilson,* 98 F.3d 281, 283–84 (7th Cir.1996). McCarthy asks us to adopt the Third Circuit's approach in *United States v. Cusumano,* which permitted the grouping of money laundering and pension embezzlement counts because "[t]he victim of all offenses in this case was the Fund and its beneficiaries," arguing that here, too, the "victim of all offenses" was the Plans and their beneficiaries. *United States v. Cusumano,* 943 F.2d 305, 313 (3d Cir.1991). The Third Circuit's characterization of the victims in a pension embezzlement and money laundering scheme clearly differs from ours. We respectfully disagree with the Third Circuit's reasoning and agree with our own precedent. *See Napoli,* 179

F.3d at 7–8. McCarthy's claim is without merit.

## B. Downward Departure

■■■■■ McCarthy asked the district court for a downward departure because his conduct was outside the heartland of typical money laundering conduct. The district court denied his request. "A district court's refusal to grant a downward departure is not appealable unless the court committed an error of law or misapprehended its power to depart." *United States v. Acevedo,* 229 F.3d 350, 356 (2d Cir.), *cert. denied,* 531 U.S. 1027, 121 S.Ct. 602, 148 L.Ed.2d 514 (2000). The district court here clearly understood it had the authority to depart, stating, "I think I have statutory authority under the guidelines and under the case law of this circuit to depart on any of the areas that you mentioned, any and all, as well as a combination of them...." It just as clearly chose not to do so, stating, "I am not convinced that this case falls outside the heartland of money laundering offenses ... I conclude that the way the events occurred here was a species of money laundering that is well within the heartland of money laundering offenses." Because the district court knew it had authority to depart from the Guidelines and made no error of law, its decision is not reviewable here.

## C. Money laundering guideline

■■■■■ McCarthy argues finally that the district court erred as a matter of law by not deeming his money laundering activity "atypical." He contends that under the Sentencing Guidelines in effect at the time of his sentencing, the district court should have sentenced him under the embezzlement guidelines as "the guideline section most applicable to the nature of this offense." U.S.S.G.App. A, at 425

(1998). At the time of McCarthy's sentencing, Appendix A provided:

> If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which defendant was convicted.

U.S.S.G.App. A, at 425. After McCarthy's sentencing, Appendix A was amended and no longer permits the district court to find a case "atypical" and sentence outside the offense guideline. *See* U.S.S.G.App. A, at 443 (2000); App. C Supp., amend. 591 (2000). The government argues that Amendment 591 applies on McCarthy's direct appeal, even though it came into effect after his sentencing, because it was intended as a clarifying amendment. We do not reach the issue of whether the amendment applies here, however, because we find the decision unreviewable. A district court's refusal to downwardly depart by choosing a guideline that requires a lower sentence based on the atypical nature of the conduct charged is unappealable unless the court fails to recognize it has authority to depart. *See United States v. Piervinanzi,* 23 F.3d 670, 685 (2d Cir.1994) (declining to review a district court decision to sentence under the money laundering guideline rather than the bank fraud guideline requested by defendant). During sentencing, the district court recognized it had authority to depart "on any of the areas ... any and all ..." that McCarthy briefed in his sentencing memorandum to the court. Therefore, the district court clearly recognized it had the authority to find the conduct at issue "atypical" and to sentence McCarthy under the embezzlement statutes, but it chose not to do so. ██ Further, even if we were to review the decision, we do not believe the

district court erred. Assuming *arguendo* that a court's choice of a guideline is reviewed by determining if defendant's conduct falls outside the heartland of cases typically within the guideline, the district court correctly found McCarthy's conduct did not represent an "atypical" money laundering case. *See Sabbeth,* 262 F.3d at 220 (declining to adopt heartland analysis for use in reviewing guidelines selection, but applying the analysis *arguendo* ). Here, laundering the Plans' money through the Alliance and Lions accounts was critical because, as the district court noted, those receiving payment "in all probability never would have accepted a check in payment for various commercial obligations that was drawn on a 401k plan or an employee pension plan. That occurrence would have been the most conspicuous of red flags." Nor are we persuaded McCarthy's money laundering case is atypical because "the funds in question were not proceeds of serious crime such as drug-trafficking or mob-related activities." We do not believe the money laundering guidelines are limited only to proceeds derived from drugs or organized crime. *See United States v. Kayode,* 254 F.3d 204, 215–17 (D.C.Cir.2001) (collecting cases). Thus, the district court used the correct guideline in sentencing McCarthy.

## CONCLUSION

For the reasons given above, we affirm both the conviction and sentence.