UNITED STATES of America,
Appellee,

v.

Jeffrey SZUR, Elaine Szur, Cary
Weinstein, Vadim Kaplun,
Defendants–Appellants,

David M. Gold, Ronald D. Gray,
Bertram Slutsky,
Defendants.

Docket Nos. 99–1517(L), 99–1556(CON),
99–1578(CON), 00–1141(CON) and
00–1142.

United States Court of Appeals,
Second Circuit.

Argued Jan. 23, 2001.

Decided May 1, 2002.

John L. Pollok, Hoffman Pollok & Pickholz LLP, (Susan C. Wolfe, on the brief), New York, NY, for Defendant–Appellant Jeffrey Szur.

Gail E. Laser, New York, NY, for Defendant–Appellant Elaine Szur.

Susan R. Necheles, Goldman & Hafetz, New York, NY, for Defendant Appellant Cary Weinstein.

Michael F. Bachner, New York, NY, for Defendant–Appellant Vadim Kaplun.

Katherine M. Choo, Assistant United States Attorney, (Mary Jo White, United

States Attorney for the Southern District of New York, Baruch Weiss, Jamie L. Kogan, and George S. Canellos, Assistant United States Attorneys, on the brief), New York, NY, for Appellee.

Before: WALKER, Chief Judge, F.I. PARKER and KATZMANN, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

After being found guilty by a jury of various offenses arising out of their involvement in an extensive securities fraud scheme, defendants-appellants Jeffrey Szur, Elaine Szur, Cary Weinstein, and Vadim Kaplun appeal from the judgments of conviction entered against them by the United States District Court for the Southern District of New York (John G. Koeltl, *District Judge*). For the following reasons, the district court's judgments are affirmed.

## BACKGROUND

### I. The Conspiracy

At the time the securities fraud conspiracy charged in the indictment began, appellant Jeffrey Szur ("Szur") was the owner and president of J.S. Securities ("JSS"), a securities brokerage firm headquartered in Bay Head, New Jersey. In the late spring of 1995, defendant Bertram Slutsky, the president and majority shareholder of U.S. Asset,[1] a publicly held corporation, proposed to Szur that JSS sell the U.S. Asset stock in Slutsky's control to JSS's retail customers and take fifty percent of the proceeds as the commission. Slutsky testified for the prosecution that it was his understanding that the amount of the commission would not be disclosed to the customers because, in his view, "an investor would not invest in a security if they knew that half the funds for that investment was going to the broker's compensation."

JSS began selling the U.S. Asset stock in August or September of 1995. Szur's mother, appellant Elaine Szur, worked as the firm's compliance officer. Her responsibilities included supervising and executing trades, ensuring compliance with regulations imposed by the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD"), and other administrative tasks. Assisted by Diane Lakin, who was Slutsky's girlfriend, Elaine Szur also confirmed sales of U.S. Asset stock.

Slutsky and Szur recruited several operators to open and run four JSS branch offices to solicit customers for U.S. Asset stock: an office at 63 Wall Street ("the Wall Street office"); an office in Westbury, Long Island ("the Westbury office"); and two unlicensed offices, one in a lower Manhattan loft and one in Brooklyn. Slutsky arranged to compensate each branch office manager with commissions that ranged from forty- to fifty-percent of the proceeds from that branch's sales of U.S. Asset stock. These commissions were paid from Szur's share of the proceeds to the branch office managers directly. Szur agreed to the arrangement because the new branch offices would increase JSS's customer base.

Slutsky and Szur recruited appellant Vadim Kaplun to manage the Wall Street office in return for a fifty-percent commission on sales of U.S. Asset stock. The Wall Street office salespeople did not disclose to customers the amount of commissions that the office was receiving. Instead, they frequently told their customers

---

**1.** U.S. Asset was later renamed Securitek International, Inc. The change of name is immaterial to this appeal. Thus, for the sake of convenience, the securities will be referred to as those of "U.S. Asset" throughout this opinion.

that they were charging only a minimal commission, such as one or two-and-a-half percent. Trade confirmations sent to customers represented that only a nominal commission had been charged, typically no more than five percent.

Upon completion of U.S. Asset sales, the Wall Street office would fax trade tickets to JSS headquarters in Bay Head, where Szur, Elaine Szur, and others would prepare the necessary documentation to effect the trades. To obtain his fifty-percent commission, Kaplun sent trade blotters to Slutsky's home each week. After cross-checking the Wall Street office trade blotters against the records maintained at JSS headquarters, Slutsky paid Kaplun, normally using checks with the payee line left blank. Kaplun, in turn, paid his salespeople fifteen- to twenty-percent commissions on the U.S. Asset sales made by each salesperson. From February to August 1996, Slutsky paid Kaplun more than $775,000 based on sales in excess of 1.38 million shares of U.S. Asset.

Appellant Cary Weinstein, together with co-defendant David Gold, managed the Westbury office. Slutsky agreed to pay Weinstein and Gold forty-five percent of any U.S. Asset stock sales made through the Westbury office. Because neither Weinstein nor Gold was a registered brokerage branch manager, they hired Paul McGlynn, a registered branch manager, to create the appearance of legitimacy. To compensate McGlynn for agreeing to sign the branch office agreement, new account forms, trade tickets, and other paperwork, Weinstein and Gold paid him twenty-five percent of the proceeds of his sales of U.S. Asset stock and a percentage of the sales of another broker.

To facilitate Westbury office sales, Weinstein and Gold arranged to place a portion of Slutsky's U.S. Asset stock in a brokerage account in the name of Opti-mum Trading, Inc., from which they sold the U.S. Asset stock to customers. Weinstein and Gold kept forty-five percent of the proceeds from those sales and remitted the balance to Slutsky. The Westbury office salespeople did not disclose to customers the amount of commissions paid to the brokers and trade tickets prepared by the office often reflected that the brokers were receiving only nominal commissions for the stock sales. In total, Weinstein and Gold received at least $350,000 for sales of at least 450,000 shares of U.S. Asset stock.

In addition to payments to the branch office managers, Slutsky periodically provided funds to Szur to cover JSS's operating expenses. On at least two occasions, Slutsky paid Szur through an account in the name of NuFocus Enterprises, Inc. ("NuFocus"), a company owned by Elaine Szur. Elaine Szur subsequently transmitted the funds from the NuFocus account to Szur, who in turn transferred the funds to JSS. When Szur was asked about the source of these funds during an NASD investigation in May or June of 1996, he falsely claimed that the funds represented fees for consulting services he had rendered to NuFocus.

Over time, for a number of reasons not relevant to this appeal, the price of U.S. Asset stock declined. In an effort to continue making money on the scheme, Slutsky began selling his shares through brokers other than Szur and JSS. By August 1996, Slutsky had ceased paying Szur or his branch office managers for sales of U.S. Asset stock and the conspiracy was at an end.

## II. Proceedings in the District Court

On February 24, 1998, the grand jury returned a twenty-eight count fifth superseding indictment (the "Indictment") against appellants Szur, Elaine Szur, Ka-

plun, Weinstein, and others, charging them with devising and executing a scheme to defraud JSS customers by selling U.S. Asset stock without disclosing that up to fifty percent of the sale price of the stock went toward brokerage commissions.

Specifically, the Indictment charged conspiracy to commit securities fraud, wire fraud, and commercial bribery in violation of 18 U.S.C. § 371 (Count One)[2]; wire fraud in violation of 18 U.S.C. §§ 1343 and 1346 (Counts Two through Eleven); commercial bribery under the Travel Act in violation of 18 U.S.C. § 1952(a)(3) (Counts Twelve through Sixteen); falsifying the books and records of JSS in violation of 15 U.S.C. §§ 78q(a)(1) and 78ff, 17 C.F.R. § 240.17a–4 (Counts Seventeen through Twenty-two); money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (Counts Twenty-three through Twenty-eight); and aiding and abetting all of the foregoing crimes in violation of 18 U.S.C. § 2.

At trial, all four appellants were convicted of conspiracy (Count One). Szur was also convicted of wire fraud (Counts Three through Five); commercial bribery in violation of the Travel Act (Count Twelve); falsifying the books and records of JSS (Counts Seventeen, Nineteen, and Twenty); and money laundering (Counts Twenty-three and Twenty-four). Szur was sentenced to a prison term of 70 months, a three-year term of supervised release, restitution in the amount of $3,709,829.50, and mandatory special assessments totaling $850.

In addition to the conspiracy count (Count One), appellant Elaine Szur was convicted of wire fraud (Counts Ten and Eleven); falsifying the books and records

of JSS (Counts Seventeen, Nineteen, and Twenty); and money laundering (Counts Twenty-three and Twenty-four). She was sentenced to 46 months of imprisonment, a three-year term of supervised release, restitution in the amount of $3,709,829.50, and mandatory special assessments totaling $550.

Appellant Kaplun was convicted of conspiracy (Count One); wire fraud (Counts Six and Seven); commercial bribery under the Travel Act (Counts Thirteen through Fifteen); and money laundering (Counts Twenty-five and Twenty-six). Prior to his sentencing, Kaplun pled guilty to another fraud charged in a separate indictment and the two cases were consolidated for sentencing purposes. The district court sentenced Kaplun to concurrent terms of 56 months of imprisonment on both indictments, three years of supervised release, restitution in the amount of $3,709,829.50, and mandatory special assessments totaling $600.

Appellant Weinstein, in addition to the conspiracy count (Count One), was convicted of commercial bribery under the Travel Act (Count Sixteen); and money laundering (Counts Twenty-seven and Twenty-eight). After trial, Weinstein entered into a sentencing agreement as a result of which the district court sentenced him to 51 months of imprisonment, a three-year term of supervised release, restitution in the amount of $3,709,829.50, and mandatory special assessments totaling $250. Because Weinstein waived his right to appeal his conviction under the agreement, he only challenges his sentence.

---

**2.** There are discrepancies in how the counts of the Indictment are numbered between the redacted version of the Indictment that was submitted to the jury and the unredacted version returned by the grand jury. We refer to the unredacted version because the numbering of counts in that version conforms to the numbering used in the district court's judgments.

## DISCUSSION

Appellants Szur, Elaine Szur, and Kaplun argue that the government failed to provide sufficient evidence to establish an essential element of the wire fraud, Travel Act, and conspiracy counts as charged in the Indictment—the existence of a duty to disclose owed by the brokers to the JSS customers. They also argue that their money laundering convictions should be vacated because the financial transactions alleged were not separate and subsequent to the specified unlawful activity. All four appellants argue that the district court erred by failing to group their fraud and money laundering convictions for sentencing purposes under § 3D1.2(b) of the United States Sentencing Guidelines ("U.S.S.G" or "the Guidelines").

Szur also argues that (1) the district court improperly excluded testimony suggesting that he was assaulted when he attempted to close the Wall Street office; (2) the district court erroneously gave him a four-level upward adjustment for his role in the fraud offenses and a two-level upward adjustment for his role in the money laundering offenses; and (3) his case must be remanded for resentencing in light of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), because the government did not prove certain facts used in calculating his sentence beyond a reasonable doubt. Elaine Szur contends that there was insufficient evidence to support her conviction for money laundering. We address each of appellants' arguments in turn.

## I. Wire Fraud, Travel Act, and Conspiracy Charges

■ Appellants Szur, Elaine Szur, and Kaplun argue that their wire fraud, Travel Act, and conspiracy convictions must be reversed because the brokers who sold U.S. Asset stock did not have a duty to their customers to disclose the amount of the commissions being charged. Appellants correctly point out that a general fiduciary duty, triggering a duty to disclose, arises when brokers have discretionary authority over their customers' accounts. Because the brokers here did not have discretionary authority, they argue that no fiduciary relationship between the brokers and the customers existed as a matter of law and thus, the brokers had no duty to disclose. Inasmuch as the government based its proof at trial on theories requiring proof of a fiduciary relationship and a corresponding duty to disclose commissions, they contend that their wire fraud, Travel Act, and, derivatively, conspiracy convictions must be reversed.

■ Although styled as an evidentiary sufficiency claim, we understand appellants to argue also that the jury was presented with invalid theories of conviction because no fiduciary duty could exist between the brokers and their customers as a matter of law in the absence of discretionary authority. Where a jury is presented with multiple theories of conviction, one of which is invalid, the jury's verdict must be overturned if it is impossible to tell which theory formed the basis for conviction. *See United States v. Foley,* 73 F.3d 484, 493 (2d Cir.1996) ("When ... the jury has been presented with several bases for conviction, one of which is invalid as a matter of law, and it is impossible to tell which ground the jury selected, the conviction must be vacated."), *abrogated on other grounds, Salinas v. United States,* 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997); *see also United States v. Zvi,* 168 F.3d 49, 55 (2d Cir.1999) ("[A] conspiracy conviction must be reversed where one or more objects is invalid and 'it is impossible to tell which ground the jury selected.' ") (quoting *Foley,* 73 F.3d at 493).

Under this framework, we will first consider whether the government was re-

quired to prove the existence of a duty to disclose the excessive commissions as an essential element of the wire fraud and Travel Act counts as charged in the Indictment and, to the extent that those charges are objects of the conspiracy, the conspiracy charge as well. Answering that question in the affirmative, we then examine whether the government's proof was sufficient to support the convictions.

### A. The Charges Against Defendants

The essence of the government's case was that the brokers deprived the purchasers of U.S. Asset stock of their right to the brokers' honest services by concealing their exorbitant commissions and by affirmatively misrepresenting that the commissions were small, typically under five percent.

 The wire fraud statutes under which defendants were charged, 18 U.S.C. §§ 1343[3] and 1346,[4] "make it a crime to devise a *scheme* to deprive another of the right of honest services." *United States v. Sancho*, 157 F.3d 918, 920 (2d Cir.1998) (per curiam).[5] In *Sancho*, we made clear that "[n]othing in either § 1343 or § 1346 indicates that the existence of an actual fiduciary duty is a necessary element of the crime." *Id.* In this case, however, the Indictment charged defendants with wire fraud under five different theories of liability, as follows:

(a) depriv[ing] a broker's customer of the intangible right to a broker's honest services;

(b) depriv[ing] a principal of the intangible right to a fiduciary's honest services;

(c) violat[ing] a broker's duty to disclose to the broker's customer all material facts concerning securities transactions in the customer's account;

(d) violat[ing] a fiduciary's duty to disclose to his principal all material facts concerning any self-interest the fiduciary might have concerning securities transactions in the principal's account; and

(e) mak[ing] false representations to a customer about the amount of remuneration to be received by a broker in connection with a securities transaction.

Indictment ¶ 63(a)-(e).

At trial, the district court instructed the jury that, in order to convict the defen-

---

**3.** Title 18 U.S.C. § 1343 provides, in pertinent part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud ... transmits or causes to be transmitted by means of wire ... communication in interstate or foreign commerce, any writings ... or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both.

**4.** Section 1346 provides that the term "scheme or artifice to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346.

**5.** Although our circuit has explicitly rejected a fiduciary duty requirement in order to sustain a conviction for the deprivation of "honest services," we have recognized that "because the statute does not define honest services, the potential reach of § 1346 is virtually limitless." *United States v. Rybicki*, 287 F.3d 257, 264 (2d Cir.2002). In an effort to curtail the statute's potential reach, a panel of this court recently reversed a conviction based on breach of contract, finding § 1346 unconstitutionally vague as applied in that case. *United States v. Handakas*, 286 F.3d 92, 106–07 (2d Cir.2002). The decision in *Handakas*, however, does not affect our determination in this case because "we are bound by this court's precedents upholding convictions under § 1346 that involved schemes ... in which the defendant breached or induced the breach of a duty owed by an employee or agent to his employer or principal that was enforceable by an action at tort." *Rybicki*, 287 F.3d at 264.

dants, it was required to find the existence of a scheme to defraud JSS customers by either "(1) making fraudulent and misleading representations about the total compensation paid ... to the brokers," or "(2) by failing to disclose facts that such brokers were under a duty to disclose—in this case, the alleged extraordinary compensation that such brokers were receiving to sell U.S. Asset Corp.[] stock to their customers."

The court then explained the circumstances under which the brokers would be under a legal duty to disclose the commissions to their clients. The district court's explanation tracked the language of our opinion in *United States v. Chestman*, 947 F.2d 551, 568–69 (2d Cir.1991) (en banc), in which we explained that a duty to disclose arises from a " 'fiduciary or other similar relation of trust and confidence between [the parties to the transaction].' " *Id.* at 565 (quoting *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980)) (alterations in original). The district court instructed the jury, in pertinent part, as follows:

> Whether a fiduciary relationship exists is a matter of fact for you, the jury, to determine. At the heart of the fiduciary relationship lies reliance and de facto control and dominance.... One acts in a fiduciary capacity when the business with which he or she transacts, or the money or property which he or she handles, is not his or her own or for his or her own benefit, but for the benefit of another person, as to whom he or she

stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.... I instruct you that a fiduciary owes a duty of honest services to his customer, including a duty to disclose all material facts concerning the transaction entrusted to it. The concealment by a fiduciary of material information which he or she is under a duty to disclose to another, under circumstances where the non-disclosure can or does result in harm to the other, can be a violation of the wire fraud statute, if the Government has proven beyond a reasonable doubt the other elements of th[e] offense.

Based on these instructions, the jury could not convict the appellants of wire fraud on any of the first four theories charged in the Indictment unless it found that the relationship between the JSS brokers and their customers was such as to give rise to a duty to disclose the commissions.[6]

 The Travel Act counts charged appellants and another co-defendant with using interstate facilities to promote commercial bribery and commercial bribe receiving in violation of New York law.[7] Under New York law, a person is guilty of commercial bribery in the second degree if he or she "confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the consent of the latter's employer or principal, with intent to influence his conduct in relation to his employer's or principal's

---

6. Appellants do not challenge the government's fifth theory of liability for wire fraud, (e), which charged appellants with making affirmative misrepresentations about the commission to be received by the broker. This theory of conviction does not require the existence of a fiduciary duty.

7. The Travel Act proscribes travel in interstate or foreign commerce or use of the mail or any

facility in interstate or foreign commerce, with intent to distribute the proceeds of, or otherwise further, promote, manage, establish, carry on, or facilitate any unlawful activity. *See* 18 U.S.C. § 1952(a). "Unlawful activity" includes "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b)(2).

affairs." N.Y. Penal Law § 180.00 (1999). New York law prohibits the receipt of commercial bribes as follows:

> An employee, agent or fiduciary is guilty of commercial bribe receiving in the second degree when, without the consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an arrangement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.

N.Y. Penal Law § 180.05 (1999). Viewed in light of the prohibitions of the New York statute, the Travel Act counts required the existence of a fiduciary, agency, or employment relationship between JSS brokers and their customers.

Given that four of the five wire fraud theories presented to the jury required the existence of a duty owed by the brokers to their customers, and the Travel Act counts required the existence of a fiduciary, agency, or employment relationship, in order for appellants' convictions to stand, we must analyze the nature of the relationship between the brokers and their customers and determine whether the relationship between them gave rise to a duty to disclose the commissions as a matter of law and in fact.

### B. The Duty to Disclose

 Since appellants do not challenge the government's theory of wire fraud involving affirmative misrepresentations, we are concerned only with the alleged omissions of material fact, namely, the failure of JSS brokers to disclose the substantial commission payments. As the district court instructed the jury, when dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose "arises [only] when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Chiarella v. United States*, 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980) (internal quotation marks omitted) (second alteration in original); *see also Chestman*, 947 F.2d at 568–69.

 Although it is true that there "is no general fiduciary duty inherent in an ordinary broker/customer relationship," *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 940 (2d Cir.1998), a relationship of trust and confidence does exist between a broker and a customer with respect to those matters that have been entrusted to the broker. This relationship places an affirmative duty on brokers "to use reasonable efforts to give [the customer] information relevant to the affairs that [have] been entrusted to them." *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir.1999) (internal quotation marks omitted); *see also Indep. Order of Foresters*, 157 F.3d at 941 (recognizing certain limited duties that a broker has in the absence of discretionary authority); *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d Cir.1994) ("A broker, as agent, has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it."); 37 Am.Jur.2d § 207 (2001) (discussing when a party has a duty to disclose because of a fiduciary duty "or other relation of trust or confidence").

It is not always easy to determine what information is "relevant to the affairs that [have] been entrusted to [the broker]" and thus must be disclosed. *Id.* We have identified three basic types of information available to a broker:

> Some information borders on insignificant minutia, the omission of which could never be actionable for fraud. Some information is clearly significant and must be disclosed accurately. Some

information, however, falls into a grey area of possible insignificance and possible significance. *Press*, 166 F.3d at 536. In *Press*, we concluded that a $158 mark-up on a T-bill valued at $102,000 at maturity was information that fell within the gray area. *See id.* at 532–33, 534–36. In the absence of a *per se* rule requiring all mark-ups to be disclosed, we rejected the claim that the broker had a duty to disclose the mark-up. *See id.* at 537.

In this case, we easily conclude that the payment of forty-five- or fifty-percent commissions on all JSS sales of U.S. Asset stock qualifies as information that is "clearly significant and must be disclosed accurately." *Id.* at 536. As we recognized in *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1469 (2d Cir.1996), "[s]ales of securities by broker-dealers to their customers carry with them an implied representation that the prices charged in those transactions are reasonably related to the prices charged in an open and competitive market." In the instant case, the commissions actually charged plainly had no relationship to the commissions that would be charged in a competitive market; the broker was receiving up to half of the proceeds from the sale of the stock. Thus, even in the absence of any general fiduciary duty resulting from discretionary authority, we hold that JSS was under a duty to disclose these exorbitant commissions because the information would have been relevant to a customer's decision to purchase the stock. Accordingly, wire fraud charges (a) through (d), which were premised on the existence of ·a duty to disclose the commissions, were proper theories of conviction for the jury's consideration.

■ We also conclude that the government presented sufficient evidence to support the wire fraud convictions. The government's trial evidence established that the brokers formed relationships of trust and confidence with their customers through the sale of U.S. Asset stock and failed to disclose to their customers the excessive commissions they were charging. In addition, although appellants have not challenged the fifth theory of wire fraud, we note that the government presented evidence that the brokers and JSS confirmation slips affirmatively misrepresented the amount of the commissions.

### C. Travel Act Convictions

■ With respect to the Travel Act convictions, as we have discussed, New York law prohibits commercial bribery of, or the receipt of bribes by, a fiduciary, agent, or employee. *See* N.Y. Penal Law §§ 180.00, 180.05. In executing the stock sales, the JSS brokers acted as agents to their customers and, therefore, the Travel Act theories were properly before the jury. At trial, the government adduced evidence that the branch office managers paid bribes in the form of enormous commissions to various salespeople to induce them to act in a manner contrary to their customers' best interests—namely, to sell U.S. Asset stock at a significant mark-up. Accordingly, we conclude that the government presented sufficient evidence to support the Travel Act convictions.

All in all, we reject appellants' challenges to their wire fraud, Travel Act, and conspiracy convictions. We have no doubt that "*any* rational trier of fact could have found the essential elements of the[se] crime[s] beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We also conclude that none of the theories presented to the jury on these counts was legally invalid, thus there is no basis to disturb appellants' convictions under *Foley*. Accordingly, we affirm appellants'

convictions for wire fraud, Travel Act violations, and conspiracy.

## II. Money Laundering

Next, appellants Szur, Elaine Szur, and Kaplun argue that their money laundering convictions must be vacated because the alleged money laundering did not use funds from previous, completed criminal activity. All three appellants were convicted under 18 U.S.C. § 1956(a)(1)(B)(i), which provides, in pertinent part, as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity ... knowing that the transaction is designed in whole or in part ... to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity ... [is guilty of a felony].

Wire fraud is a "specified unlawful activity" under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).

Szur and Elaine Szur were convicted on counts Twenty-three and Twenty-four of the Indictment, which charged that transfers of wire fraud proceeds in the amounts of $40,000 and $10,000 were made from Slutsky to a NuFocus bank account controlled by the Szurs on May 13, 1996 and May 17, 1996, respectively. Kaplun was convicted on counts Twenty-five and Twenty-six, which charged him with making two deposits of wire fraud proceeds that he received from Slutsky in the amounts of $13,650 and $11,000 on February 22, 1996 and February 28, respectively, into an account at Citibank. Evidence presented at trial demonstrated that all of these funds were obtained by Slutsky from fraudulent

sales of U.S. Asset stock made through JSS.

 Appellants argue that the alleged money laundering activities did not involve "proceeds" of wire fraud, but were simply part of the wire fraud scheme itself. They contend that, since the Indictment charged a scheme to pay the co-conspirators significant compensation for the sale of the stock without disclosing such payments to the investors, the wire fraud scheme was not complete until they received their payments, and thus, the transfers and deposits from Slutsky could not be "proceeds." Because this issue involves a mixed question of law and fact, we review appellants' money laundering convictions *de novo*. *See United States v. Fernandez–Antonia*, 278 F.3d 150, 156 (2d Cir.2002).

 Appellants' theory rests upon an erroneous understanding of what comprises "proceeds" of wire fraud. Section 1956(a)(1)(B)(i) requires first that there be proceeds from a specified unlawful activity, known to be such by the defendant, and, second, that the defendant conduct or attempt to conduct a financial transaction with those proceeds, knowing the transaction is designed to conceal or disguise the nature or source of the funds. 18 U.S.C. § 1956(a)(1)(B)(i); *see United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir.2001); *cf. United States v. Piervinanzi*, 23 F.3d 670, 679–80 (2d Cir.1994) (interpreting analogous § 1956(a)(1)(A)(i)). We thus agree with part of appellants' argument: § 1956(a)(1) requires that proceeds of unlawful activity exist before money laundering can occur.

We have held that "when the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction." *McCarthy*, 271 F.3d at 395. However, we have refined this rule to pro-

vide that "funds become proceeds when they are 'derived from an already completed offense, or a *completed phase* of an ongoing offense.'" *Id.* (quoting *United States v. Conley*, 37 F.3d 970, 980 (3d Cir.1994)) (emphasis added).

In determining whether the underlying crime, or a discrete phase of that crime, has been completed so as to generate "proceeds," the central inquiry is one of distinctness, not timing. As explained by the Seventh Circuit in *United States v. Mankarious*, 151 F.3d 694 (7th Cir.1998), "money laundering does not focus on the specifics of the predicate offense, it does not matter when all the acts constituting the predicate offense take place. It matters only that the predicate offense has produced proceeds in transactions *distinct* from those transactions allegedly constituting money laundering." *Id.* at 706 (emphasis added); *see also McCarthy*, 271 F.3d at 395 ("Our case law consistently distinguishes between the crime that produces proceeds and the subsequent crime of laundering those proceeds, even though the transactions may flow together.").

In the case before us, the government presented sufficient evidence to establish distinct offenses. The monies were first obtained by Slutsky as a result of fraudulent sales of U.S. Asset stock by JSS employees or agents. While this fraud was only one phase of the larger scheme charged in the Indictment, which included subsequent payments to the Szurs and Kaplun, it was sufficiently distinct to generate "proceeds" within the meaning of § 1956(a)(1). When portions of the proceeds from those fraudulent sales were subsequently transferred from Slutsky to Szur, Elaine Szur, and Kaplun, the appellants engaged in money laundering by passing the proceeds through accounts in order to conceal the nature and source of the funds. The proceeds that formed the basis for the Szurs' money laundering convictions were first deposited in Elaine Szur's NuFocus bank account, then transferred to Szur, and finally to JSS; the proceeds Kaplun was charged with laundering were negotiated through a Citibank account in the name of Raisa Gritsaenko.

That the funds involved in the money laundering offenses constituted appellants' compensation for their involvement in the wire fraud scheme is beside the point—the funds comprised "proceeds" at the moment they were in "the control of the perpetrators," and that moment occurred as soon as Slutsky received them. *United States v. Allen*, 76 F.3d 1348, 1361 (5th Cir.1996) (interpreting 18 U.S.C. § 1956(a)(1)(B)(i)); *see United States v. Morelli*, 169 F.3d 798, 805–09 (3d Cir.1999) (concluding that funds were the proceeds of fraud when removed from the victims and placed in perpetrators' control). The subsequent transfers, to NuFocus and the Gritsaenko Citibank account, were thus properly considered by the jury as violations of § 1956(a)(1)(B)(i) and there is no basis to disturb those convictions.

## III. Grouping of the Fraud and Money Laundering Counts

All four appellants contend that the district court should have grouped their fraud and money laundering counts for sentencing purposes, pursuant to Section 3D1.2(b)[8] of the Guidelines. Section

---

**8.** Section 3D1.2 provides, in pertinent part, as follows:

All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:

. . . .

(b) When counts involve the same victim and two or more acts or transactions connected

3D1.1(a) of the Guidelines establishes a three-step procedure for determining the proper offense level in a case, like this one, that involves multiple counts of conviction. First, counts that are "closely related" must be grouped in accordance with the provisions of § 3D1.2. Each group is then assigned an offense level, based on the count with the highest offense level within that group. *See* U.S.S.G. § 3D1.3. Finally, if there is more than one group, § 3D1.4 provides that the combined offense level is derived by determining "units" for each group and adding offense level increases for each group to the offense level for the group with the highest specified offense level.

■ At sentencing, the district court declined to group appellants' wire fraud and money laundering counts under § 3D1.2(b), concluding that the fraud and money laundering counts involved different victims. Based on this determination, the district court added two offense-level points for the money laundering group to the offense-level calculation for the grouped fraud counts for each appellant under § 3D1.4. We review the district court's interpretation and application of the Guidelines *de novo* and its factual determinations underlying the application of the Guidelines for clear error. *United States v. Ahmad*, 202 F.3d 588, 590 (2d Cir.2000).

■ Appellants argue that the wire fraud and money laundering offenses in this case were so tightly interwoven that the victims of the two offenses were the same. As a general rule, "[t]he 'victims' of fraud counts are those persons who have lost money or property as a direct result of the fraud," while "[t]he 'victim' of money laundering is ... ordinarily society at large." *United States v. Napoli*, 179 F.3d

1, 7 (2d Cir.1999). Indeed, we have held that "most cases" involving fraud and money laundering do not warrant grouping as they "generally involve different harms to different victims." *United States v. Sabbeth*, 262 F.3d 207, 221 (2d Cir.2001), *reconsideration denied*, 277 F.3d 94 (2d Cir. 2002); *see also United States v. Kalust*, 249 F.3d 106, 109–10 (2d Cir.) (finding no distinction between "concealment" money laundering and "promotion" money laundering under 18 U.S.C. § 1956(a)(1)(A)(i) for purposes of grouping), *cert. denied sub nom. Percan v. United States*, —— U.S. ——, 122 S.Ct. 213, 151 L.Ed.2d 152 (2001).

■ In *Napoli*, however, we "left open the possibility of grouping fraud and money laundering if they are 'so highly interwoven ... that the [] victim' of each is the same." *Sabbeth*, 262 F.3d at 221 (quoting *Napoli*, 179 F.3d at 8 n. 3) (first alteration in original). Appellants argue that their case falls into the exception posited in *Napoli* on the basis that their money laundering and fraud offenses involved the same victims because the proceeds of the fraud were used to compensate the fraud's perpetrators and to pay for expenses related to the scheme. The use of criminally derived proceeds to perpetuate a fraud does not, however, lead inexorably to the conclusion that the victims of the fraud are the same as the victims of the money laundering. *See Kalust*, 249 F.3d at 109; *see also United States v. Green*, 225 F.3d 955, 960 (8th Cir.2000) ("Reinvestment [of proceeds] itself does not make the victim of money laundering the same as the victim of fraud."), *cert. denied*, 531 U.S. 1127, 121 S.Ct. 884, 148 L.Ed.2d 793 (2001).

In declining to group the counts at sentencing, the district court made the following findings:

by a common criminal objective or consti- tuting part of a common scheme or plan.

[I]t cannot be said that the money laundering and fraud were so highly interwoven that the counts should be grouped. This was not a case where, for example, the money laundering was part of a Ponzi scheme to keep the scheme afloat. There were no individual investors who were the direct victims of the money laundering, while it was the individual investors who were the victims of the fraud counts. The victim of the money laundering was society because the crime was disguised. Thus, as in *Napoli*, there were different harms to different victims and grouping is not appropriate.

 We agree with the district court's conclusion that the victims of the fraud and money laundering offenses in this case were distinct—the individual investors suffered from appellants' fraud, while the public as a whole was the victim of appellants' attempts to conceal their relationship to one another and the source of their illegally obtained funds. *See* U.S.S.G. § 3D1.2, cmt. n. 2 (1998) (explaining that "victim," as used in § 3D1.2(a) and (b) "is not intended to include indirect or secondary victims"). For example, when asked about the source of the funds obtained from NuFocus, Szur lied to the NASD, claiming that the funds were compensation for consulting services. This impeded the discovery of the true source of the funds and delayed the revelation of the fraudulent scheme to the public's detri-

ment. Accordingly, we affirm the district court's ruling with respect to the grouping issue.[9]

## IV. Szur's Remaining Claims

### A. Right to Present a Defense

Szur argues that the district court unconstitutionally impaired his right to present a defense by excluding evidence from which he could argue that he had made efforts to thwart, rather than further, the ends of the conspiracy. Specifically, Szur challenges the district court's exclusion of evidence that, he contends, proves he attempted to shut down the Wall Street office and that his efforts to do so were met with physical violence.

At trial, Szur offered the testimony of P.J. Seto, who worked at the Wall Street office, to the effect that Szur tried to close the office due to unhappiness with the way it was being run. In a proffer, Szur referred to two instances of violence allegedly related to the conspiracy: (1) during the period when Szur was attempting to close the Wall Street office, Seto observed Szur emerge from a room at the Wall Street branch after meeting with some of the co-conspirators, including Kaplun, and that "it appeared that Mr. Szur's face had been beaten and that Mr. Szur was crying"; and (2) a week or two later, Kaplun or another co-conspirator took Seto to an office where Seto witnessed "a bloody scene" and was

---

9. Subsequent to the district court's judgments, the Sentencing Commission amended § 2S1.1(a)(1), the Guidelines provision applicable to money laundering, such that the base offense level for money laundering is to be determined by the "offense level for the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1 (2001). However, this amended provision is of no assistance to the appellants because the "amendment regarding grouping of money-laundering and its underlying offenses is a substantive change to the Sentencing Guidelines." *United States v. Sabbeth*, 277 F.3d 94, 99 (2d Cir.2002). When a change to the *Guidelines is substantive in nature, and is not* "merely a clarification," it is not retroactively applicable. *United States v. Kim*, 193 F.3d 567, 578 (2d Cir.1999); *see generally United States v. Kirkham*, 195 F.3d 126, 131 (2d Cir.1999) ("[T]his Court is required to apply amendments to the Guidelines that clarify their application on direct review.").

told that a registered salesperson who had formerly been at JSS had been beaten.

The district court excluded the foregoing evidence at trial as both irrelevant and potentially unfairly prejudicial under Rule 403 of the Federal Rules of Evidence. That rule provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

 "[W]e review evidentiary rulings for abuse of discretion." *United States v. Sewell,* 252 F.3d 647, 650 (2d Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 382, 151 L.Ed.2d 291 (2001); *see also United States v. Salameh,* 152 F.3d 88, 110 (2d Cir.1998) (reiterating that we will second-guess a district court's Rule 403 determination " 'only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally' " (quoting *United States v. Valdez,* 16 F.3d 1324, 1332 (2d Cir.1994))). In this case, Szur invites us to apply a heightened standard of review because the district court's exclusion of a portion of Seto's testimony deprived him of the opportunity to present a defense. We decline the invitation.

 Although we recognize that a criminal defendant has a fundamental right to present a defense, *see Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), that right remains "subject to countervailing public interests." *Lurie v. Wittner,* 228 F.3d 113, 133 (2d Cir.2000) (internal quotation marks omitted), *cert. denied,* 532 U.S. 943, 121 S.Ct. 1404, 149 L.Ed.2d 347 (2001). As we said in *United States v. Blum,* 62 F.3d 63, 67 (2d Cir.1995), such a right "must be balanced against a court's leave to set reasonable limits on the admission of evi-

dence." Thus, even where the exclusion of evidence affects the defense case, we afford judges broad latitude "in excluding evidence that poses an undue risk of 'harassment, prejudice [or] confusion of the issues,' " and review their evidentiary determinations for abuse of discretion. *Id.* (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)) (alterations in original).

 At trial, the district court found that Seto's proposed testimony regarding the first incident was irrelevant because "we don't know what went on in the room, even if there had been a beating, whether in fact it is related to a falling out among alleged coconspirators or to something else." The district court similarly found that the evidence regarding the second incident was irrelevant. The district court also determined, as to both incidents, that the slight probative value of the incidents was clearly outweighed by the danger of unfair prejudice to Kaplun.

Szur has failed to show that the district court abused its discretion or acted irrationally or arbitrarily in excluding Seto's testimony. *See Salameh,* 152 F.3d at 110. Given Seto's incomplete knowledge regarding the alleged instances of violence about which he sought to testify, the questionable relevance of the evidence, the substantial potential prejudice to Kaplun, and the likelihood that it would sow confusion in the mind of the jury, we see no reason to disturb the district court's ruling.

### B. Upward Adjustments at Sentencing

Szur next argues that he should not have received upward adjustments in his sentence for a leadership role in the offenses, pursuant to U.S.S.G. § 3B1.1, because co-defendant Slutsky conceived, organized, managed, and primarily profited from the fraudulent scheme. In essence,

Szur argues that because of the significant disparity between his and Slutsky's roles, he should not receive the maximum four-level upward adjustment for the fraud offenses. He similarly contends that he should not have received a two-level upward adjustment for the money laundering offenses, arguing that he was neither a leader nor an organizer of the money laundering activity.

 " 'The sentencing court's findings as to the defendant's role in the offense will be overturned only if they are clearly erroneous.' " *United States v. Zichettello*, 208 F.3d 72, 107 (2d Cir.2000) (quoting *United States v. Farah*, 991 F.2d 1065, 1068 (2d Cir.1993)), *cert. denied sub nom. Lysaght v. United States*, 531 U.S. 1143, 121 S.Ct. 1077, 148 L.Ed.2d 954 (2001). Section 3B1.1(a) of the Guidelines provides for a four-level increase if the criminal activity involved five or more participants and the defendant was an "organizer or leader." U.S.S.G. § 3B1.1(a). "[A] prerequisite to a section 3B1.1(a) enhancement is that the district court makes specific factual findings that (i) the defendant was an organizer or leader, and (ii) the criminal activity involved five or more participants, or was otherwise extensive." *United States v. Escotto*, 121 F.3d 81, 85 (2d Cir.1997). *See generally United States v. Beaulieau*, 959 F.2d 375, 379–80 (2d Cir.1992) ("Whether a defendant is considered a leader depends upon the degree of discretion exercised by him, the nature and degree of his participation in planning or organizing the offense, and the degree of control and authority exercised over the other members of the conspiracy.").

In this case, the district court rejected Szur's arguments against the upward adjustments based on Szur's role in the

fraud, and imposed the four-level increase prescribed by § 3B1.1(a). It is not disputed that more than five participants were involved in the fraud activity, and the district court found at sentencing that Szur acted in a leadership role:

> He [Szur] and Slutsky conceived the scheme and he was to receive half of the proceeds of the sale of the U.S. Asset stock. It was from his share of the proceeds that the others who sold stock from the other offices were paid. Mr. Szur was involved in the recruitment of others to sell the U.S. Asset stock and the stock was sold from the offices of Mr. Szur's firm. Mr. Szur recruited defendants Weinstein and Gold as well as [another co-defendant]. Mr. Szur plainly approved the opening of each of the offices and oversaw the sale of the U.S. Asset stock. Mr. Szur was the owner of the firm and active participant in the scheme, ultimately responsible for the control of the branch offices and a principal beneficiary of the crime through the expansion of his firm. He plainly qualifies as an organizer and leader of the criminal activity.

The district court's findings are supported by the trial record. Thus, the enhancement under § 3B1.1(a) was not error.

 We likewise reject Szur's argument that the district court erred in imposing a two-level upward adjustment under § 3B1.1(c) [10] for a leadership role in the money laundering activity. At sentencing, the district court made the following findings:

> It was Mr. Szur who was responsible for instructing Mr. Slutsky and M[s]. Lakin how the transfers were to be made, and he explained that the funds were not to

---

**10.** Section 3B1.1(c) of the Guidelines provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described [above in subsections] (a) or (b)." U.S.S.G. § 3B1.1(c).

be paid directly to J.S. Securities, but to other accounts as he directed.... Mr. Szur, therefore, was the leader of this money laundering activity.

Again, the district court's factual findings with respect to Szur's role in the money laundering offenses are fully supported by the trial record. We therefore affirm Szur's two-level enhancement under § 3B1.1(c).

## C. Apprendi

■ Finally, Szur argues that his sentence violates the Supreme Court's holding in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Szur argues that, under *Apprendi*, the district court was not permitted to make the following increases to his total offense level under the Guidelines: (1) a thirteen-level increase under the fraud guideline based on the amount of the fraud; (2) a four-level increase for his leadership role in the fraud offenses; (3) a one-level increase on the money laundering counts based on the amount of money laundered; and (4) a two-level increase for his role in the money laundering offenses. We disagree.

In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490, 120 S.Ct. 2348. On the conspiracy, wire fraud, and Travel Act charges, Szur was exposed to a maximum sentence of five years for each count. *See* 18 U.S.C. §§ 371, 1343, and 1952(a)(3). On the falsification of books and records counts, the maximum possible sentence was ten years per count. *See* 15 U.S.C. § 78ff. For money laundering, 18 U.S.C. § 1956 provides for a maximum sentence of twenty years.

Szur was sentenced to 70 months' imprisonment, which, although greater than the statutory maxima he faced on some counts, did not exceed the twenty-year statutory maximum he could have received on the money laundering counts. Thus, his *Apprendi* claim is wholly without merit. *See United States v. Thomas*, 274 F.3d 655, 664 (2d Cir.2001) (en banc) ("The constitutional rule of *Apprendi* does not apply where the sentence imposed is not greater than the prescribed statutory maximum for the offense of conviction."); *see also United States v. Rivera*, 282 F.3d 74, 76–77 (2d Cir.2002) (per curiam) (holding that courts are to proceed on a "count-by-count" basis "[i]n assessing whether a defendant has received an impermissible sentence" under *Apprendi* ).

## V. Evidentiary Sufficiency of Elaine Szur's Money Laundering Conviction

Elaine Szur argues that the evidence was insufficient to establish that she committed money laundering. As discussed in Part II, Szur and Elaine Szur were convicted on counts Twenty-three and Twenty-four of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), which charged that Slutsky transferred wire fraud proceeds in the amounts of $40,000 and $10,000 into a NuFocus bank account on May 13, 1996 and May 17, 1996, respectively.

■ We review challenges to evidentiary sufficiency *de novo*, "view[ing] the evidence presented in the light most favorable to the government, and ... draw[ing] all reasonable inferences in its favor." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000). A defendant challenging his conviction on sufficiency grounds "bears a heavy burden." *United States v. Finley*, 245 F.3d 199, 202 (2d Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 1101, 151 L.Ed.2d 997 (2002). "[T]he conviction

must be sustained if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Fiore,* 821 F.2d 127, 128 (2d Cir.1987); *see Jackson,* 443 U.S. at 319, 99 S.Ct. 2781.

 To establish the knowledge element required to convict a defendant of money laundering, the government must prove that "the defendant knew of the transaction's obfuscatory purpose." *United States v. Maher,* 108 F.3d 1513, 1526 (2d Cir.1997). Elaine Szur argues that the government failed to prove this element at trial. Specifically, she contends that simply being a recipient of the funds is insufficient to establish the requisite intent and that there was no evidence showing that she knew the wire transfers into her account were designed to conceal or disguise the funds. We disagree.

The evidence established that Elaine Szur was the owner and president of Nu-Focus at the time the funds from Slutsky were received, and that, after the funds from Slutsky were deposited in the NuFocus account, Elaine Szur wired the funds to accounts controlled by her son. The jury could have reasonably inferred that NuFocus itself had done nothing to warrant the receipt of any funds from Slutsky. Viewed in the light most favorable to the government, the evidence was sufficient for the jury to conclude that Elaine Szur knew of the obfuscatory purpose of the May 1996 transfers and that, by washing the funds through the NuFocus account, she participated in the transfers to help conceal the nature, source, and identity of the money. *See United States v. Willey,* 57 F.3d 1374, 1384–87 & n. 24 (5th Cir. 1995) (rejecting argument that there was no design to conceal when transactions were conducted using accounts to which defendants had known relationship). Ac-

cordingly, we affirm Elaine Szur's conviction on both money laundering counts.

## CONCLUSION

The judgments of the district court are affirmed.