**In re REFCO INC. SECURITIES LITIGATION.**

**Marc S. Kirschner, as Trustee of the Refco Private Actions Trust, Plaintiff,**

**v.**

**Phillip R. Bennett et al., Defendants.**

**Nos. 07 MDL 1902(JSR), 07 Civ. 8165(JSR).**

United States District Court, S.D. New York.

Aug. 30, 2012.

Katie Mckenzie Anderson, Fellers Snider Blankenship Bailey & Tippens P.C., Oklahoma City, OK, Maaren Alia Choksi,

Nicholas John Calamari, Richard Irving Werder, Jr., Stephen Andrew Broome, Quinn Emanuel Urquhart & Sullivan LLP, Michael Barry Carlinsky, Rex Lee, Robert Craig Juman, Sascha Nicholas Rand, Quinn Emanuel, New York, NY, for Plaintiff.

## MEMORANDUM

JED S. RAKOFF, District Judge.

On June 16, 2012, Special Master Daniel J. Capra issued a Report and Recommendation (the "GT SJ R & R") recommending that the Court deny the motion for summary judgment of defendant Grant Thornton LLP. After receiving the parties' written objections, oral arguments, and supplemental briefing on choice of law, the Court considered the entire matter *de novo*, and, by "bottom-line" Order dated July 27, 2012, denied defendant's motion for summary judgment. This Memorandum sets forth the Court's reasons for that ruling.

To start, the Court finds itself in agreement with Special Master Capra's excellent Report and Recommendation in all material respects and hereby adopts it in full as if incorporated herein. Because, however, Grant Thornton, in objecting to the Report and Recommendation, raised the issue of choice of law, which was not presented to the Special Master, the Court writes separately to address that issue.[1] The Court presumes full familiarity with the facts surrounding the Refco fraud and Grant Thornton's alleged involvement, *see* GT SJ R & R at 1–2, and recites here only those facts relevant to the issue of choice of law.

The Trustee brings this aiding and abetting fraud action against Grant Thornton as the assignee of the claims of customers of Refco Capital Markets ("RCM") who deposited funds in foreign exchange accounts at RCM, known in these multi-district proceedings as the "FX Customers." RCM held itself out as an offshore brokerage firm, incorporated and registered in Bermuda, which was not subject to U.S. federal or state securities laws and regulations. *See* Declaration of Catherine Joyce dated July 20, 2012 ("Joyce Decl.") Ex. F (certificate of incorporation); *id.* Ex. G (FX Customer agreement); *Capital Management Select Fund Ltd. v. Bennett,* 680 F.3d 214, 220, 231 (2d Cir.2012). The FX Customers are scattered to the four winds—but none is domiciled in New York. *See* Joyce Decl. Ex. B (list of FX Customer addresses).

Because Grant Thornton is here sued as aiding and abetting fraud, the Trustee must first show the existence of a primary violation by RCM, *i.e.,* a fraud committed by RCM on the FX Customers. *See Kirschner v. Bennett,* 648 F.Supp.2d 525, 533 & n. 11 (S.D.N.Y.2009) (citing *JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247, 252 (S.D.N.Y.2005)). Relevant to that primary violation, the Second Circuit has recently opined on the relationship between RCM and its customers in the context of securities customers who brought claims alleging that RCM committed securities fraud by breaching their brokerage agreements through rehypothecating[2] the

---

**1.** As a matter of practice, the Court would normally have referred the newly presented issue to the Special Master for reconsideration. *See, e.g.,* Supplemental Order, *Krys v. Sugrue,* 08 Civ. 3065, D.E. 598 (S.D.N.Y. Apr. 9, 2012). Since, however, trial in this case is firmly set to begin on September 4, 2012, the Court directed supplemental briefing after oral argument, so as to resolve the issue in

advance of trial. *See* Order dated July 16, 2012.

**2.** Rehypothecation, in the general sense, refers to a broker using or pledging the use of its customer's margin account securities to obtain financing for its own transactions. *Capital Management,* 680 F.3d at 220 n. 4.

securities in their brokerage accounts. *See Capital Management,* 680 F.3d at 218–19. In rejecting the securities customers' claims, the Second Circuit held that RCM, by holding itself out as an unregulated offshore broker-dealer, disclaimed any obligation to comply with U.S. broker-dealer laws and regulations regarding rehypothecation. *See id.* at 220–23, 228–29, 231–32, 233–34.

This Court agrees with the Special Master that the determination in *Capital Management* that RCM gave clear notice that it was not bound by U.S. broker-dealer laws and regulations regarding rehypothecation does not preclude the FX Customers from asserting New York common law fraud claims for inducing the FX Customers' deposits in the first place. *See* GT SJ R & R at 4–6. But that does not address the first-order question: does New York tort law even apply to the FX Customers' claims?

■ At oral argument held before the Court on July 13, 2012, Grant Thornton argued that that RCM—a Bermuda entity dealing with far-flung FX Customers around the world, who expressed no indication that they knew they were dealing with a New York brokerage—should not be subject to a New York common law duty to disclose its "hopeless insolvency." Transcript of Oral Argument dated July 13, 2012 ("Tr.") at 17–25. Neither party at oral argument, however, knew whether Bermuda law imposed a similar duty to disclose. Accordingly, the Court ordered supplemental briefing on (1) whether Bermuda imposed a similar duty to disclose, thereby obviating any conflict; and (2) if not, whether the Court should apply New York law or Bermuda Taw to the FX Customers' claims. *See* Order dated July 16, 2012. Having reviewed the parties' supplemental briefing, the Court answers the questions posed thusly: (1) Bermuda law does not impose a duty to disclose hopeless insolvency or the like. (2) Nonetheless, under choice of law principles, New York is the locus of the fraud alleged and New York law applies to the primary violation allegedly committed by RCM.

A federal court sitting in diversity applies the choice of law rules of the forum state, here, New York. *See Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP,* 612 F.Supp.2d 267, 283 (S.D.N.Y.2009) (citing *Klaxon v. Stentor Elec. Mfg.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Under New York choice of law rules, the Court must first determine whether there is any actual conflict between New York and Bermuda law. *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998).

Here, the procedural history of this case has left the FX Customers with one primary violation allegedly committed by RCM: that RCM failed to disclose it was "hopelessly insolvent" before accepting the FX Customers' deposits, in violation of a New York common law duty to disclose. *See* GT SJ R & R at 6–12 (citing *Craigie v. Hadley,* 99 N.Y. 131, 1 N.E. 537 (1885); *St. Louis & S.F. Ry. Co. v. Johnston,* 133 U.S. 566, 10 S.Ct. 390, 33 L.Ed. 683 (1890)). Based on the parties' submissions to the Court, however, it appears that Bermuda does not recognize the duty to disclose hopeless insolvency or the like.

The Trustee puts forth two Bermuda law principles as analogous to the New York duty to disclose hopeless insolvency: implied agency and affirmative misrepresentation. *See* Plaintiff's Supplemental Memorandum of Law on Choice of Law dated July 20, 2012 ("Pl. Supp. Br.") at 5–6. As Grant Thornton correctly argues, however, both of these theories have already been rejected as creating liability in this case even as a matter of New York law, *see* PAT R & R at 15–16; *Kirschner,* 648 F.Supp.2d at 535–37, and neither gets

to the place that the hopeless insolvency duty occupies: whether a nondiscretionary broker who is not a fiduciary and has not made an affirmative misrepresentation nevertheless has a common law duty to disclose hopeless insolvency before accepting customer money. *See* GT SJ R & R at 6–7 (citing PAT R & R at 13; *United States v. Szur*, 289 F.3d 200, 211–12 (2d Cir.2002)). To the contrary, Grant Thornton submits persuasive authority from its Bermuda law experts suggesting that Bermuda treats the relationship between a broker and its customers as simply a matter of contract. *See* Declaration of Mark Guy Chudleigh dated July 20, 2012 ("Chudleigh Decl.") ¶¶ 4–5; Declaration of Kehinde Abinbola Lucille George dated July 20, 2012 ("George Decl.") ¶¶ 10–12; *Green v. Lines Overseas Mgmt. Ltd.*, Bda. L.R. 53 (2002) (imposing customary contractual terms, and not fiduciary or common-law duties, in broker case without written contract).

In particular, *Szur* imposes a duty on a broker to affirmatively disclose certain significant information, whereas Bermuda courts have generally refused to expand the obligations of a broker to his customers beyond contractual obligations. Chudleigh Decl. ¶ 4; *White v. Conyers Dill & Pearman*, Civil Appeal No. 31 of 1993 at 5 (Court of Appeal for Bermuda), *cited with approval in Phoenix Global Fund Ltd & Anor v. Citi Group Fund Servs. (Bermuda) Ltd & Anor* (Civil Jurisdiction 2006: No. 20) at 263 (Supreme Court of Bermuda). Accordingly, in the absence of a case on point showing that Bermuda recognizes a duty to disclose hopeless insolvency or the like, the Court concludes that Bermuda law and New York law differ on this issue. *See* Fed.R.Civ.P. 44.1.

■ Having identified a conflict between Bermuda and New York law, the Court must now decide which law applies to the claims brought by the Trustee on behalf of the FX Customers. In a tort law case, New York uses an "interests analysis" to determine which law governs, applying the "law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 284 (2d Cir.2006) (citation and internal quotation marks omitted); *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). In weighing the interests in a tort case, New York distinguishes between "conduct regulating" and "loss allocating" rules. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 543 (2d Cir.1999). Conduct regulating rules are those "governing conduct to prevent injuries from occurring"; loss allocating rules "are those which prohibit, assign, or limit liability after the tort occurs." *Padula*, 84 N.Y.2d at 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001; *see also Cooney v. Osgood Mach.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993).

■ Here, the question of whether a broker has a duty to disclose that it is hopelessly insolvent before accepting a customer's funds is clearly a conduct regulating rule designed to prevent brokers from fraudulently inducing deposits that customers will never get back. *Cf. Thomas H. Lee Equity Fund V*, 612 F.Supp.2d at 284 (holding that negligent misrepresentation and fraud claims against Mayer Brown for misrepresenting Refco's financial condition in connection with LBO involved conduct regulating rules). It would, after all, be difficult to allocate loss between the parties when one of the parties is insolvent. When the conflict involves rules that regulate conduct, the site of the tort governs. *Padula*, 84 N.Y.2d at 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001; *accord Sheldon v. PHH Corp.*, 135 F.3d 848, 853 (2d Cir.1998).

Grant Thornton argues that the locus of the tort is Bermuda, focusing primarily on the reasonable expectations of the parties. *See Schultz v. Boy Scouts of Am.*, 65 N.Y.2d 189, 201 n. 3, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) (considering parties' expectations in loss allocating rule case). Grant Thornton argues that RCM held itself out as a Bermuda entity, that it maintained Bermuda incorporation, Bermuda directors and meetings, and Bermuda counsel, and that the customers who chose to deal with RCM knew they were dealing with an offshore entity, not a New York entity, and not an entity subject to U.S. broker-dealer laws and regulations. *See Capital Management*, 680 F.3d 214. Indeed, Grant Thornton argues that no FX Customer was domiciled in New York, *see* Joyce Decl. Ex. B, and that at least one customer believed, for example, that RCM was a London entity, Tr. at 21. Therefore, Grant Thornton argues, New York has no interest in regulating RCM's relationship with the FX Customers.

The Court disagrees. Although RCM is the specific Refco entity that the Trustee alleges defrauded the FX Customers, the alleged "hopeless insolvency" that gave rise to the fraud in the first place goes well beyond this offshore brokerage subsidiary, and encompassed Refco as a whole. The Refco umbrella of companies included three primary operating subsidiaries, of which RCM was one. *Capital Management*, 680 F.3d at 219. RCM was used as a piggy bank to fund the Refco fraud—Refco insiders used client money deposited at RCM to disguise its financial condition, *see id.* at 223; *Kirschner*, 648 F.Supp.2d at 528–32—but the alleged "hopeless insolvency" created by the Refco fraud that

gave rise to RCM's duty to disclose was a result of tortious (and indeed, criminal) conduct carried out in New York. *See Thomas H. Lee Equity Fund V*, 612 F.Supp.2d at 284 (applying New York law in choice of law dispute because, *inter alia*, New York "is the jurisdiction where the Refco fraud originated and where substantial activities in furtherance of the fraud . . . were committed" and the "overwhelming bulk of events surrounding . . . the underlying fraud occurred in New York where Refco was headquartered").

Moreover, even RCM itself was based in significant part in New York. While RCM operated as a Bermuda company in order to avoid U.S. securities laws and regulations, in 2001, two and a half years before the commission of the deposits at issue here, RCM "repatriated" its operations from Bermuda to the United States and closed its Bermuda office in January 2002. *See Kirschner*, 648 F.Supp.2d at 530 n. 8; Declaration of Nicholas J. Calamari dated July 20, 2012 ("Calamari Decl.") Ex. 1 ("Dispenza Dep.") at 35–36; *see also* Calamari Decl. Ex. 5 ("Maggio Dep.") at 48.[3] The Refco insiders sued as individual defendants in this action worked in New York. Even RCM's communications to its customers were mailed from a New York mailing address. Dispenza Dep. at 256; Calamari Decl. Exs. 2–3.

While Grant Thornton argues that the New York mailing address was simply "RCM c/o Refco Securities LLC," Calamari Decl. Exs. 2–3; *see also* Joyce Decl. Ex. E at 9–10 (Trustee describing RCM as "Bermuda-registered company" that was not "regulated" in the United States), this just proves the Court's point. Refco Secu-

---

**3.** Grant Thornton notes that this repatriation involved relocating RCM's back office operations to New Jersey, Am. Compl. ¶ 264, and its trading operations to Vienna, Joyce Decl. Ex. P at 677–79. But this does not change

the fact that after December 2001 RCM had no significant ties to Bermuda, whereas RCM's principal place of business in 2004 and 2005 was New York. Calamari Decl. Ex. 4 ("Kraker Dep.") at 21.

rities LLC was Refco's on-shore, regulated brokerage subsidiary. In effect, Refco gave its customers a menu of options. Choose RCM, and choose an offshore brokerage unconstrained by U.S. securities laws and regulations. Or choose Refco Securities LLC, and choose an on-shore brokerage. Thus, while the subsidiaries functioned as a form of regulatory arbitrage, Refco effectively operated as one entity. In particular, Refco operations were controlled centrally from New York, and Refco employees operated both Refco Securities LLC and RCM. *See* Kraker Dep. at 21 (noting RCM's principal place of business was New York). Indeed, even *Capital Management*, on which Grant Thornton heavily relies, noted that:

> Although RCM was organized under the laws of Bermuda and represented itself as a Bermuda corporation, it operated from New York at all relevant times. These operations were under the leadership of, and through a sales force of account officers and brokers employed by, its affiliated corporation, Refco Securities, LLC, ("RSL"), a wholly-owned subsidiary of Refco that operated as a U.S.-based broker-dealer registered with the SEC

*Capital Management*, 680 F.3d at 220.

The contractual choice to avoid U.S. regulations was one the customers made, and the Second Circuit has upheld the Court's prior ruling that the customers' *choice* to invest money in an offshore brokerage firm was one they made knowingly and voluntarily, and one they cannot now complain about as a misrepresentation. *Capital Management*, 680 F.3d at 230 ("Here, more than simply remaining silent as to whether it was complying with U.S. law, RCM represented that it was *not* a U.S.-regulated company."). But this is wholly distinct from determining the locus of any claim that is actionable. Here, when Refco crossed the line into illegality, Refco insiders siphoned off money from one Ref-

co entity to another in a complicated scheme of heroic proportions to disguise Refco's financial condition. *Kirschner*, 648 F.Supp.2d at 528–32. The efforts to disguise Refco's financial condition—and as a consequence, RCM's financial condition—and the subsequent failure to disclose that alleged hopeless insolvency to the FX customers, were centered in New York.

The difference between *Capital Management* and this case may thus be described as the difference between the law governing the *going-forward* relationship between the brokerage customers and RCM, and the position of RCM vis-à-vis customers at the time the customers made the decision to deposit their funds at RCM. At that time, it is undisputed that RCM said nothing to the FX Customers regarding its alleged hopeless insolvency. The question of whether RCM was hopelessly insolvent, giving rise to a duty to disclose, relates entirely to the Refco fraud, which was centered in New York.

Therefore, applying New York choice of law principles to this case, the Court concludes that New York has greater interests in this action than Bermuda, and thus that New York law applies to the Trustee's claims. Accordingly, the Court, reaffirming its "bottom line" Order of July 27, 2012, hereby denies defendant's motion for summary judgment. As previously indicated, trial will begin on September 4, 2012, at 9 A.M.